**Electronically Filed
Supreme Court
SCWC-16-0000004
17-DEC-2019
08:22 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellee,

vs.

MICHAEL LIMJUCO ABELLA,
Petitioner/Defendant-Appellant.

SCWC-16-0000004

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-16-0000004; CR. NO. 14-1-1253)

DECEMBER 17, 2019

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY RECKTENWALD, C.J.

This case requires us to determine whether a defendant may be convicted of homicide if the victim's death was the immediate result of a choice by the victim's family to withdraw medical care. Michael Limjuco Abella was charged with Murder in the Second Degree after severely beating Shelton Higa on July 17,

2014.  Higa was comatose for more than a week thereafter; medical professionals estimated that his chances of survival were slim, and if he did survive, his quality of life would likely be poor. He was removed from life support and declared dead on July 29, 2014, twelve days after the altercation.  In the Circuit Court for the First Circuit, a jury found Abella guilty of the lesser-included offense of Manslaughter.  The Intermediate Court of Appeals (ICA) affirmed the conviction.

Abella argues that a defendant in these circumstances cannot be charged and convicted of a homicide due to a provision in the Uniform Health-Care Decisions Act that prohibits designating as a homicide any "[d]eath resulting from the withholding or withdrawal of health care" under the Act.  Hawai'i Revised Statutes (HRS) § 327E-13(b) (2010).  Abella asserts that the plain language of the statute shields him from conviction under these circumstances.  We disagree.  Viewing the Act as a whole and given the historical context that led to its passage, it is clear that the legislature intended to protect medical professionals and family members making difficult choices, not actors like Abella.

However, we nonetheless vacate the judgment on appeal and remand this case for a new trial.  Abella argues, and we agree, that the jury should have been given instructions on causation pursuant to HRS §§ 702-215 (2014) and 702-216 (2014). Those instructions would have enabled the jury to consider whether the intervening volitional conduct of the family and

medical team interrupted the chain of causation between Abella's actions and Higa's death such that it would be unfair or unjust to hold him criminally culpable for homicide.  While we recognize without qualification that the decision to remove a loved one from life support is difficult and serious, and the law protects that choice, nevertheless, the issues of causation raised in this case must be decided by a jury.  Consequently, we hold that it was plain error for the circuit court to fail to instruct the jury on causation and culpability pursuant to HRS §§ 702-215 and 702-216.

## I.  BACKGROUND

### A.  Circuit Court Proceedings

Abella was charged by indictment in the Circuit Court of the First Circuit with Murder in the Second Degree in violation of HRS § 707-701.5 (2014).[1]  His jury trial began on September 21, 2015.[2]

### 1.  Witness' Testimony

The following testimony was adduced at trial.

### a.  Events of July 17, 2014

Witnesses Ronald Landrio and Donald King each testified that on July 17, 2014, at approximately 8:45 p.m., they were at the intersection of Smith and Pauahi Streets in Honolulu when

---

[1]     The Honorable Colette Y. Garibaldi presided.

[2]     As relevant to Abella's prosecutorial misconduct claim, which we decline to reach, see infra note 9, Abella filed a pre-trial motion in limine requesting a number of things.  At the hearing for the motion, State agreed not to "comment upon [Abella's] assertion of his right to remain silent prior to, or during, trial[.]"

3

they heard the sound of a glass bottle breaking. Each looked in the direction of the sound and saw Shelton Higa fall to the ground.

Landrio further testified that after Higa fell to the ground, a man stood over Higa and began punching him. King testified that after Higa fell to the ground, a man, whom he identified as Abella, began "very violently" kicking Higa several times, "trying to strike his head as much as he can." As Higa was on the ground, King noticed that Higa was "holding his head" and "trying to protect himself." King testified that he saw Higa getting struck "[i]n the head, in the shoulders, and arms, because . . . [Higa was] trying to cover his face and his head."

Landrio testified that while the man was punching Higa, a group of people went over and stopped the man. The man then left the area.

An ambulance and police officers arrived at the scene at 9:04 pm. Honolulu Police Department (HPD) Officer Celestino Herana testified that he was dispatched to Smith and Pauahi Streets on an assault call at approximately 8:54 p.m. and met Higa. Higa was holding the right side of his head, which was red and swelling. Officer Herana detected a slight odor of alcohol emanating from Higa's breath, but Higa was coherent. Officer Herana took photographs of the scene, had Higa fill out paperwork, and left.

Kell Tanabe, Jr., then a paramedic-in-training for the City and County of Honolulu, testified to examining Higa and

4

witnessing superficial lacerations to the right side of his face and a hematoma[3] to his right temple. Tanabe testified that Higa's vital signs were stable and that Higa refused a ride to the hospital.

Antoinette Tuituu testified that she saw the ambulance leave, and she went over to talk to Higa. She said that Higa was sitting at first, and then he got on his hands and knees, trying to stand up and return to the ambulance. She recounted that Higa said he felt dizzy, and he asked Tuituu to call the ambulance again.

Tuituu continued that as Higa was on his hands and knees, "[t]hat guy came ([pointing to Abella in the courtroom]) and starting hitting him just out of the blue[.]" Tuituu testified that Abella "was wild" and hitting Higa on the head with both hands. After seeing Higa get hit about "five, six times," Tuituu ran to the police station about a block away to get help.

King testified that he saw Abella kicking Higa "more than several . . . maybe up to 14 or 20" times. He said that Higa was attempting to get away, but since there was a wall in front of him, it was "like he's trying to crawl into the wall to get away from this guy."

Landrio testified that he intervened after seeing "the

---

[3] A hematoma is "a mass of usually clotted blood that forms in a tissue, organ, or body space as a result of a broken blood vessel." Merriam-Webster's Collegiate Dictionary 579 (11th ed. 2009).

same figure[,]" whom he identified as Abella, "beating on [Higa] again." Landrio noted that Higa was not fighting back during the incident because of his poor health.

Landrio "came up behind [Abella] and grabbed him to stop him from hitting [Higa] again." Landrio and Abella then started punching each other, causing Landrio's glasses to go "flying" off of his face, and for Landrio to have a bloody nose and hurt shoulder. Landrio testified: "I managed to get a couple of shots in. He was hitting pretty good, so I jumped off into the street on Smith Street again, just to regroup myself." According to Landrio, Abella then walked back toward Higa, hit him a few more times, and "just walked off down Pauahi Street."

Tuituu testified that after she returned from the police station to call for help, she saw Abella walking away. Tuituu and King both testified that they began following Abella until they caught up with him. At approximately 9:42 p.m., Officer Herana responded to the same area on an assault call and arrested Abella.

### b. Abella's Testimony

During the defense's case-in-chief, Abella took the stand, advancing a theory of self-defense. Abella testified that on July 17, 2014, at around 8:45 p.m., he was present in Chinatown near Smith and Pauahi. He testified that he was "just hanging around" with other people, and around that time, he saw an ambulance and police lights. He said that he did not go to check it out, but instead walked over to the River of Life

6

Mission to see what food would be served.  He testified that Higa came up to him and instigated the fight; per Abella, "he just hit me."  After that, Abella claimed that another person jumped in the fray, and he just blocked hits until he left.  He further claimed that he did not know Higa nor know why Higa would hit him.

Abella identified Higa in a photograph and acknowledged that Higa was older than him, but said, "he was quicker.  He hit me quick.  He hit me twice in my jaw."  In response to the State's questions, Abella acknowledged that he did not have time to react to the second punch, but thereafter, Abella reacted by hitting Higa, and did not stop hitting Higa until Landrio broke it up ("He jump in, too, yes.")  Abella said that he and Landrio exchanged punches a "little bit . . . .  But I - I fled after that."  Abella said that after he finished fighting with Landrio, he walked over by the Fort Street Mall and was stopped by police.  On cross-examination, Abella said he thought he (Abella) has "a pretty good punch[.]"[4]

### c.  Higa's Medical Care

Ashley Hashimoto, then a paramedic-in-training, testified that at approximately 9:52 p.m., she responded to an assault call at Smith Street in Chinatown, and when she arrived,

---

[4]      As relevant to the prosecutorial misconduct claim, on cross-examination, the State asked Abella whether he reported to the police "that this 57-year-old man had thrown two punches so fast that you couldn't respond in time[.]"  Thereafter, the defense moved for a mistrial, arguing that this line of questioning commented impermissibly on Abella's right to remain silent.  The State immediately withdrew the questions, and the court ordered the jury to disregard.  The court denied the motion for a mistrial.

she saw Higa lying on his back, rolling around, and screaming. Higa was able to provide his name and date to the responding medical team, but could not answer any other questions and was "yelling and screaming and rolling." The responding medical team placed Higa in "full spinal mobilization," started an IV, took his vital signs, and transported him to Queen's Medical Center.

Higa was taken to Queen's, a trauma center, for a possible brain injury and multiple contusions. Hashimoto testified that there are a range of symptoms that could indicate a brain injury, some of which Higa exhibited: Higa was "altered"; "very combative and agitated"; and had "significantly high" blood pressure.

At Queen's, Higa was seen by the emergency room doctor and was sent for a CT scan of his brain. Higa was given a sedative before undergoing the CT scan. He fell unconscious and did not regain consciousness thereafter.

Dr. Susan Steinemann, a surgeon who was qualified as an expert in trauma and general surgery, testified that she saw Higa after his CT scan. By the time Dr. Steinemann saw Higa, he was "comatose" and "would not open his eyes. He was not able to vocalize. And he had only some minimal movements of his arm and leg." In grading the degree of his coma, Dr. Steinemann explained that a score of three "would be someone that's basically dead" and a score of fifteen "is normal." Dr. Steinemann scored Higa as a five.

On cross-examination, defense counsel asked Dr.

Steinemann about Higa's sedation prior to his CT scan, suggesting that Higa was verbal when he was first admitted to the emergency room and that he was sedated prior to his CT scan because he was agitated. Dr. Steinemann testified that she did not review the record regarding Higa's state when he was first admitted, but agreed that, in general, an agitated patient may be administered a sedative prior to a CT scan, as "[t]he quality of the scan would be poor if the patient were moving."[5]

Dr. Steinemann testified that the type of sedation given to Higa "go[es] away in a fairly predictable period of time." She said, "We don't generally sedate people to the point of unconsciousness" prior to a CT scan. She acknowledged that for surgeries, "[o]nce they're under anesthesia, they're unconscious." Regarding Higa's state after his CT scan and prior to surgery, defense counsel asked "And he was not conscious at that time; isn't that correct?" Dr. Steinemann replied, "No, he was comatose."

On direct examination, Dr. Steinemann testified that Higa was comatose "[b]ecause of his severe brain injury" (a "large subdural hematoma" or, in other words, "bleeding inside the skull[.]"). A subdural hematoma is dangerous because, as "the blood clot enlarges, it puts pressure on the brain and squashes the brain down[.]" So, "[a] brainstem herniation is

---

[5] Dr. Eric Oshiro similarly testified that in most circumstances, prior to a CT scan, "a short-acting sedative" is used, and is expected to "wear[ ] off" after the CT scan.

often the response to significant subdural hematoma."

When asked to describe how a subdural hematoma and brainstem herniation relate to being comatose, Dr. Steinemann explained that "the subdural hematoma, where it is located, will tend to affect more of the higher brain functions, the thinking, the ability to control movements[,]" while "[t]he brainstem controls those very basic life responses, breathing and heart rate." She explained that "the brainstem herniation is usually the last thing to happen before somebody's considered brain dead."

When asked to describe the size of the bleeding based on Higa's CT scan, Dr. Steinemann testified that it was "[d]eadly. If he didn't have emergency surgery, deadly. And even with emergency surgery, high – high mortality would be expected." She testified that "[t]he prognosis even with surgery for a bleed of this type is – is not good."

Higa's neurosurgeon, Dr. Oshiro, testified about the craniotomy procedure he performed on Higa and the blood clot he saw inside Higa's skull. Dr. Oshiro testified that Higa was in a coma when Dr. Oshiro met him, and he was on a ventilator prior to the surgery and after the surgery.

Dr. Oshiro said that Higa's CT scan "confirmed that there was a large blood clot on the surface of the brain . . . that was compressing the brain." He testified that from reviewing Higa's presenting exam and his CT scan, Higa's blood clot was "a life-threatening situation." He noted that while

"not all" blood clots on the brain are life-threatening, Higa's was. He drew this conclusion based on "[t]he size" of the clot as well as "the fact that on clinical exam, he had a dilated pupil, which is indication of brainstem compression."

Dr. Oshiro testified that external injuries, such as a skull fracture, are not necessarily indicative of a serious brain injury. He testified that this kind of bleeding "is a direct result of the acceleration/deceleration injury to the brain," which he explained "can occur without actually cracking the skull" and "without having a noticeable outward sign of injury." Dr. Oshiro stated that this kind of injury can occur from trauma, such as "[s]ome sort of impact, blow to the head." He testified that Higa's hematoma could be created by "somebody str[iking] him on the right side of the skull with a 40-ounce beer bottle, which cracked the glass" due to an occurrence called a "contracoup injury." Because there is space inside the skull for the brain to move, if the skull is hit on one side, the impact can cause the brain to "bounce[ ]" and "hit[ ] the other side" of the skull. He explained that in this regard, the location of the hematoma in relation to the location of the impact is "not that predictable." Dr. Steinemann also testified that Higa's injury would be consistent with being punched or kicked in the head.

Dr. Oshiro testified that the craniotomy procedure had "satisfactory results as far as removing the blood clot and reducing the pressure on the brain." He observed Higa's brain surface turn from "very tense" to having "a normal pulsation that

11

curves with the heartbeat," and he saw that Higa's dilated pupil on the left side "came back down" after the surgery.

"[U]nfortunately," however, a successful procedure "does not guarantee a full recovery" because "sometimes you can't tell before doing the surgery how much damage is done already, how much damage is permanent, [or] how much can be . . . improved by reducing the pressure." According to Dr. Oshiro, "[i]n other words, there may be some permanent injury to the brain already done that cannot be reversed."

After the craniotomy, Dr. Oshiro examined Higa every day. He noticed that "[t]here was very slight improvement. His pupils were reactive to light; that is, they reacted normally when you shine a light. Normal reaction is they constrict. But he never fully regained consciousness."

From July 20 to July 28, 2014, notes in Higa's medical record provided as follows. On July 20, a note indicated "minimal change" in Higa's neurological exam. On July 21, Higa had a "slight eye opening," which, in comparison to where he was before, indicated "a slight bit of consciousness." Higa also reacted to a sternum rub, which is "an irritating kind of maneuver" used "to get a reaction" from a patient. A July 22 note stated that "his eyes open briefly, and he blinks to threat and tracks a little," thus "show[ing] a slight improvement in consciousness."

On July 25, Higa likewise showed a "slight improvement in the neurologic exam" compared to the previous day. He was

"clearly localizing with left arm," meaning that when he was given a sternum rub, he was able "to localize where the stimulus is coming from and actually reach toward it[,]" as opposed to an "abnormal response," which would be "no movement at all" after a sternum rub.  This, again, showed "little gradations of consciousness" and was "somewhat of an improvement[.]"  On July 26, Higa showed "a slight improvement in eye opening."

On July 27, Higa was "more alert" and "improving levels of alertness with sustained eye opening[.]"  On July 28, Higa's "eyes open to voice," thus indicating "a slight improvement in consciousness."  He had a "stable neurologic exam," meaning "that it's not worsening."

When asked whether Higa "was ever going to regain independent breathing[,]" Dr. Oshiro testified that there was a "less than 50/50" chance.  He opined that while it was "probably possible" for Higa to regain independent breathing, it was "not more likely than not."  Dr. Steinemann testified that based on the significance of Higa's brain injury, if care were not withdrawn, she "would expect that his prognosis would be poor for return to independent living."

With respect to taking a patient off life support, Dr. Steinemann explained that the decision "is usually made in consultation with the family based upon the patient's previously expressed wishes about quality of life."  Dr. Oshiro testified that he does not recall whether he was "physically present" when Higa's breathing tube was removed.  He did not state whether he

was aware that Higa's improvements were or were not communicated to Higa's next of kin, and noted that "these decisions are primarily made by the intensive care physician" or "the neurointensive care physician."

On July 27, Higa's daughter and next-of-kin (Daughter) was notified about her father's presence at the hospital, where she worked as a registered nurse. Daughter had an "estranged relationship" with her father, but she was aware of his kidney problems and that he was "going blind."

Daughter testified that after a social worker called and found her, she spoke with an "ICU doctor" named Dr. Chang who told her about Higa's present condition and presented her with the decision to take Higa off life support.

Daughter said she decided to take her father off life support because:

> [DAUGHTER:] I knew what he -- we had talked about that before when my grandmother was on life support and we had to make that decision. And I've seen what happens when you leave people on life support who -- and the doctors' prognosis.
>
> [STATE]: Which was what?
>
> A. That he wasn't going to have any kind of a meaningful recovery, and he'd probably be hooked up to the ventilator and wouldn't be able to regain an independent lifestyle.

Daughter testified that she was informed about Higa's condition over the previous ten days in which he was under the care of Dr. Steinemann and Dr. Oshiro. She said that she was provided "a summary of what happened in the surgery and his current condition[,]" but she was not notified "as to the

14

improvement in his condition regarding his neural exams throughout the ten days[.]" She testified that, as a nurse, she has seen people in a condition like her father's. She said that she has never seen other people in such a condition regain or even "somewhat regain" their faculties.

### d.   Higa's Death

Higa was pronounced dead on July 29, 2014, after his breathing tube was removed.

Dr. Oshiro opined that the sedation administered prior to the CT scan did not kill Higa. Dr. Oshiro also testified that while Higa had end-stage renal disease, which complicated his recovery, the renal disease did not cause Higa's death.[6] Dr. Oshiro testified that the subdural hematoma caused Higa's death.

The following exchange took place between defense counsel and Dr. Oshiro on recross-examination:

> [DEFENSE COUNSEL:] . . . . in this case, there was slight

---

[6]     Higa's end-stage renal disease meant that he could not survive unless he was on dialysis. Dr. Oshiro did not know the last time Higa had dialysis, but testified that he could "take a guess" that "it hadn't been very recent" based on Higa's blood test. Dr. Oshiro explained that Higa's "creatinine and his BUN [blood urea nitrogen] were markedly elevated as well as his potassium in his blood." When asked to explain the blood interaction with the body's organs, Dr. Oshiro stated that the answer was "very complex" and "beyond the scope of what I can answer." However, he provided an example that "potassium being high could make him go into a bad heart rhythm, which would be fatal." He also suggested that "electrolyte abnormalities" could cause fluid accumulation in the lungs that "may create a problem with oxygenation from the lungs."
    When asked how the quality of the blood might affect the brain, Dr. Oshiro noted that "the blood clotting is probably not completely normal," meaning "that it probably takes a little bit longer for the blood to clot than it normally would." Dr. Oshiro also noted that "the brain doesn't function as well as it normally should" when blood is not processed through dialysis when necessary.
    Dr. Christopher Happy, the medical examiner, was asked whether the end-stage renal disease contributed to Higa's condition, to which Dr. Happy responded: "to his overall health, sure, but not his death."

improvement happening on a day-to-day basis; right?

[DR. OSHIRO:] Yes.

Q. And there's no telling where that improvement was going to stop at that point when -- I mean, in two weeks' time that you had him under your care, Mr. Higa; is that right?

A. Correct.

Q. And you said just before we took a recess that the cause of death was the subdural hematoma, but you really -- that's not really accurate, because isn't it true that Mr. Higa could well have survived a little longer than the two weeks without them pulling the tubes and pulling the plug? Isn't that right?

A. Yes.

Q. I mean, he wasn't at a stage where he was going to die right then and there?

A. That is correct.

On July 30, 2014, Dr. Christopher Happy, the chief medical examiner for the City and County, performed an autopsy on Higa. Dr. Happy concluded that Higa's death was caused by "[c]omplications from blunt force head injury with subdural hemorrhage." He read Higa's medical records and could see during the autopsy that Higa had a prior surgery to remove the blood from around his brain. He explained that when there is bleeding around the brain, it creates pressure in a finite space and begins to push the brain downward "through the large hole at the bottom of the skull." He explained that "the first thing that goes through that hole is the brainstem[,]" which is "where the blood pressure, heart rate, and respiratory rate are controlled." He testified that when it is pushed down, the brainstem is impinged, "[a]nd so the heart will stop, breathing will stop."

16

Dr. Happy testified that the brain injury Higa received "in you or me or anybody healthy would cause death." He further explained that a toxicology report was conducted. He said that the report indicated "some morphine, which was given in the hospital for pain control," as well as "acetone, which is a ketone, which is sometimes formed after a prolonged period of a person being essentially brain dead."

On cross-examination, Dr. Happy testified that he was not aware that, after Higa's craniotomy, he was "improving in his alertness[.]" However, he testified that this fact would not have made a difference in his final report regarding Higa's cause of death.

### 2. Motion for Judgment of Acquittal

After the close of the State's evidence, the defense made an oral motion for judgment of acquittal. Defense counsel asked the court to grant the motion based on HRS § 327E-13(b),[7] arguing that the statute provides a basis for dismissing the murder charge, as well as "other lesser charges" that cover the death of a person. He contended that "we could continue the trial on the basis of an assault in the second degree or less."

---

[7] HRS § 327E-13(b) provides:

> Death resulting from the withholding or withdrawal of health care in accordance with this chapter shall not for any purpose constitute a suicide or homicide or legally impair or invalidate a policy of insurance or an annuity providing a death benefit, notwithstanding any term of the policy or annuity to the contrary.

Although the legislature amended HRS § 327E-13 in 2018, subsequent to Abella's trial, subsection (b) remains unchanged.

In response, the State argued that HRS Chapter 327E should not absolve criminal defendants from penal liability under these circumstances. The State argued: "[HRS §] 327E-13(b) applies, and it applies to [Daughter] in this case. It does not apply to the defendant. To do so would lead to an absurd result."

In rebuttal, defense counsel focused on "the plain language of the statute," and argued that "the standard that the legislature has put on this type of case" means "that nobody's going to be held responsible for homicide if someone else pulls the plug." The court asked him whether anything in the legislative history supported his argument, to which he replied:

> Well, I did not go into the legislative intent of this statute. However, when the -- when they say, shall not for any purpose constitute a homicide, they know what a homicide is. It's not a surprise to them, that murder is a homicide, involves homicide. Manslaughter involves homicide. Assault in the first degree involves potentially a homicide. So it's not a surprise to the legislature that those types of cases are happening under -- under the framework of homicide. So, you know, it's in the plain language of this statute, you know, so I would assume that the legislature knew what it was doing when it did this.

The court denied the motion. The court determined that the statute's "reference that death from withholding medical care would not constitute a homicide or suicide appears to protect healthcare providers and the decision-makers," as well as "the beneficiaries of the decedent[.]" It reasoned that defense counsel's reading of the statute "would produce absurd results in situations similar to" this case.

18

3.   **Jury Instructions**

The parties agreed to the court's general jury instructions and reviewed the court's supplemental instructions.

Supplemental instruction "T" provided: "Conduct is the cause of a result when it is an antecedent but for which the result in question would not have occurred."  The defense objected to this instruction and argued, "I think it confuses - this instruction is more confusing than anything.  It's not necessary.  It's duplicative of what's going on in the [c]ourt's general instructions."  The State, on the other hand, argued that the instruction was necessary

> in light of the fact that it was the defendant's conduct that caused the subdural bleed which put him in respiratory distress which caused him to be put on the ventilator and lose consciousness, which ultimately resulted in the decision by his daughter to take him off life support.  So all of these events stem from the defendant's conduct.
> In other words, but for the defendant's conduct, none of the - the operation or the treatment at Queen's or lifesaving decision would have occurred.  So in light of the facts of this case, this is an applicable and relevant statement of the law to help the jury explain - help the jury.

The court included the instruction over defense's objection, noting that the instruction came verbatim from HRS § 702-214 (2014).  Defense counsel did not request an instruction on causation pursuant to HRS §§ 702-215 and -216, and the court did not provide one.

Ultimately, the jury was instructed with regard to the offenses of Murder in the Second Degree, Manslaughter based upon reckless conduct, Assault in the First Degree, Assault in the

19

Second Degree (Substantial Bodily Injury), Assault in the Second Degree (Serious Bodily Injury), Assault in the Third Degree, and Reckless Endangering in the Second Degree.  The jury was also instructed as to self-defense, deadly force, causation, and the relevant states of mind.  The Manslaughter instruction read:

> If and only if you find the Defendant not guilty of Murder in the Second Degree or you are unable to reach a unanimous verdict as to this offense, then you must consider whether the Defendant is guilty or not guilty of the included offense of Manslaughter based upon reckless conduct.
> A person commits the offense of Manslaughter based upon reckless conduct if he recklessly causes the death of another person.
> There are two material elements of this offense, each of which the Prosecution must prove beyond a reasonable doubt.
> These two elements are:
>
> 1.  That <u>on or about July 17, 2014, to and including July 29, 2014</u>, in the City and County of Honolulu, State of Hawaii, the <u>Defendant caused the death</u> of Shelton Higa; and
>
> 2.  That the Defendant did so recklessly.

(Emphasis added.)

Consistent with its ruling as to instruction "T," the court instructed the jury on causation as follows: "Conduct is the cause of a result when it is an antecedent but for which the result in question would not have occurred."

### 4.  Verdict and Sentence

The jury returned a verdict finding Abella guilty of Manslaughter pursuant to HRS § 707-702 (2014).  The circuit court subsequently sentenced Abella to a term of imprisonment for twenty years.  Abella timely filed a notice of appeal.

**B.    ICA Proceedings**

On appeal, Abella argued that the circuit court plainly erred by failing to instruct the jury regarding the causal connection, or lack thereof, between Abella's conduct and Higa's death.  He also claimed that the circuit court erred by failing to apply HRS § 327E-13 to his case.  Accordingly, Abella asked that the ICA reverse the circuit court's judgment and dismiss his case.[8]

Abella argued that the circuit court plainly erred when it failed to instruct the jury, sua sponte, on the issue of causation between Abella's conduct and Higa's death, and that this failure was prejudicial.  Abella contended that his conduct could not have caused Higa's death, in light of the twelve days that passed between the confrontation at issue and his death, and the intervening acts by numerous persons within that time frame, "i.e., medical treatment, and a decision made that terminated Higa's life."

In light of these circumstances, Abella argued that Higa's death was "too remote" or "too dependent on another's

---

[8]     Abella also argued that the circuit court should have ordered a mistrial in light of the prosecutor's attempts to elicit testimony from Abella about why he did not report his interactions with Higa to the police.  See supra note 4.  Abella argued that the prosecutor's line of questioning encroached upon Abella's constitutional right to remain silent.

The ICA did not credit this argument, determining that the prosecutor's actions did not amount to misconduct, and even if the questioning was improper, the circuit court's subsequent instructions to the jury constituted a "prompt curative instruction."  State v. Abella, 144 Hawai'i 141, 152, 438 P.3d 273, 284 (App. 2019).

Abella raises this issue again in his application for writ of certiorari.  Because, as discussed infra, we decide this case on the basis of the jury instructions and remand for a new trial as a result, we need not and do not reach this issue.

volitional conduct" to assign responsibility to Abella for Higa's actual death.  As such, Abella argued that the instructions as a whole, which did not include a causation instruction based on HRS §§ 702-215[9] and -216[10], were "prejudicially insufficient, erroneous, inconsistent, and misleading."

Abella also argued that the circuit court erred by failing to apply HRS § 327E-13 to his case when its plain language prohibited his conviction.  Abella explained that, pursuant to HRS § 327E-13, a "[d]eath resulting from the . . . withdrawal of health care in accordance with [Chapter 327E] shall not for any purpose constitute a . . . homicide," and that further, under Chapter 327E, "death" occurs "when a person has experienced [the] irreversible cessation of spontaneous respiratory and circulatory functions" and "at the time when the irreversible cessation of the functions first coincide."

Applying Chapter 327E, Abella contended that Higa's death necessarily occurred when his ventilator was removed, and could not have occurred before that time.  Abella pointed to Dr. Oshiro's testimony that "Higa had a 50% possibility of regaining independent breathing," that "there was no telling where that improvement was going to stop," and that "Higa could have survived longer than he did" had his ventilator not been withdrawn.

_____

[9]     For the text of HRS § 702-215, see infra note 12.

[10]    For the text of HRS § 702-216, see infra note 13.

The ICA disagreed.  State v. Abella, 144 Hawaiʻi 141, 438 P.3d 273 (App. 2019).  With regard to Abella's argument that the medical treatment was an intervening cause of Higa's death, citing to several cases from other jurisdictions, the ICA determined that the "removal of life support is not an independent intervening cause [of death] in settings similar to the instant case."  Id. at 148, 438 P.3d at 280.  The ICA therefore concluded that the circuit court did not plainly err in failing to instruct the jury "regarding intervening acts by persons terminating Higa's medical treatment."  Id. at 149, 438 P.3d at 281.

In addition, based on the plain language of HRS § 327E-13, the ICA determined that, "[c]ontrary to Abella's argument, HRS § 327E-13(b) applies to advance health-care directives and other health-care decision-making procedures and the persons involved.  It does not apply to criminal conduct which leads to the need for health-care."  Id. at 150, 438 P.3d at 282 (emphasis added).  The ICA further noted that the relevant legislative history lacked any indication that HRS § 327E-13(b) was meant to "absolve defendants of alleged criminal conduct which necessitated that a victim receive medical treatment in the first place."  Id.  Accordingly, the ICA rejected Abella's argument that HRS § 327E-13(b) should apply.

On the circuit court's failure to give jury instructions pursuant to HRS §§ 702-215 and 702-216, the ICA concluded that the "removal of life support is not an independent

23

intervening cause [of death] in settings similar to the instant case," citing to cases from other jurisdictions. Id. at 148-49, 438 P.3d at 280-81. Accordingly, the ICA held that the circuit court did not plainly err by failing to give those instructions. Id. at 149, 438 P.3d at 281.

## C. Supreme Court Proceedings

Abella timely filed an application for a writ of certiorari, which we accepted. His application argues that the ICA gravely erred for not reversing the trial court on the basis of HRS § 327E-13. In addition, Abella urges us to hold that the trial court's failure to instruct the jury "regarding the causal connection[,] or lack thereof, between Abella's conduct and Higa's death" constituted plain error.

## II. STANDARDS OF REVIEW

### A. Statutory Interpretation

"Questions of statutory interpretation are questions of law to be reviewed de novo under the right/wrong standard." Nakamoto v. Kawauchi, 142 Hawaiʻi 259, 268, 418 P.3d 600, 609 (2018).

### B. Jury Instructions

"When jury instructions . . . are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." State v. Nichols, 111 Hawaiʻi 327, 334, 141 P.3d 974, 981 (2006).

## III.  DISCUSSION

**A.  HRS § 327E-13 Does Not Prevent a Jury from Convicting Abella of Homicide**

We first consider whether HRS § 327E-13 applies to this case, which is a matter of statutory interpretation.  We hold that it does not.

When construing a statute, "our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself."  Nakamoto, 142 Hawai'i at 268, 418 P.3d at 609 (quoting Lingle v. Hawai'i Gov't Emps. Ass'n, AFSCME, Local 152, AFL-CIO, 107 Hawai'i 178, 183, 111 P.3d 587, 592 (2005)).  "A 'cardinal' canon of statutory interpretation is that this court 'cannot change the language of the statute, supply a want, or enlarge upon it in order to make it suit a certain state of facts.'"  State v. Haugen, 104 Hawai'i 71, 75, 85 P.3d 178, 182 (2004) (quoting State v. Dudoit, 90 Hawai'i 262, 271, 978 P.2d 700, 709 (1999)).

Nevertheless, statutory language is read "in the context of the entire statute" and interpreted "in a manner consistent with its purpose."  Haugen, 104 Hawai'i at 76, 85 P.3d at 183 (quoting Gray v. Admin. Dir. of the Court, 84 Hawai'i 138, 148, 931 P.2d 580, 590 (1997)).  We construe statutes "to avoid, if possible, inconsistency, contradiction, and illogicality."  Id. (quoting State v. Cornelio, 84 Hawai'i 476, 484, 935 P.2d 1021, 1029 (1997)) (emphasis omitted).  If a literal construction

of statutory language would produce an absurd result, we presume
that result was not intended and construe the statute in accord
with its underlying legislative intent.  See id. at 77, 85 P.3d
at 184 (citing Dudoit, 90 Hawai'i at 270, 978 P.2d at 708).

Abella argues that he was entitled to an acquittal
based on HRS § 327E-13(b), a provision in the Uniform Health-Care
Decisions Act (Modified).  HRS § 327E-13(b) provides:

> (b) Death resulting from the withholding or withdrawal
> of health care in accordance with this chapter shall
> not for any purpose constitute a suicide or homicide
> or legally impair or invalidate a policy of insurance
> or an annuity providing a death benefit,
> notwithstanding any term of the policy or annuity to
> the contrary.

(Emphasis added.)

In effect, Abella interprets this statute to supply a
general defense to criminal liability whenever a crime victim is
allowed to die from their injuries due to "the withholding or
withdrawal of health care."  HRS § 327E-13(b).  He contends that
because Higa died from the decision by Daughter and the medical
team to withdraw care, his death "shall not for any purpose
constitute a . . . homicide[.]"  According to Abella, the terms
"for any purpose" plainly and unambiguously prevent the State
from holding anyone criminally liable for Higa's death.  Thus, he
argues, the statute absolves him of criminal liability, and he
was accordingly entitled to a judgment of acquittal.

However, we conclude that HRS § 327E-13(b), when read
in context, applies only to the persons involved in making and
carrying out health-care decisions.  Chapter 327E codifies in

26

Hawai'i the right to refuse life-sustaining medical treatment, a right that is incident to the rights to privacy, bodily autonomy, and self-determination.  The parameters of the right to refuse life-sustaining treatment have common law origins and may be traced to the seminal case In re Quinlan, 355 A.2d 647 (N.J. 1976), cert. denied sub nom. Garger v. New Jersey, 429 U.S. 922 (1976).

In Quinlan, the Supreme Court of New Jersey recognized that "the State's interest [in the preservation of life] weakens and the individual's right to privacy grows as the degree of bodily invasion increases and the prognosis dims."  355 A.2d at 664.  The court held that under the circumstances, Ms. Quinlan's right to refuse further life-sustaining medical treatment outweighed the State's interests.  Id.  Recognizing that Ms. Quinlan was no longer competent to assert this right, the court also held that the only practical way to protect it would be to permit her family to assert it on her behalf.  Id.  Further, the court considered the relationship between this right and the criminal law.  The Quinlan court made clear that physicians who carry out these wishes would not be held criminally liable for terminating life-sustaining treatment, consequently accelerating the patient's death.  Id. at 669–70.

Since this 1976 decision, state courts and the United States Supreme Court have recognized the right to refuse treatment, and developed tests for determining how and when this right may be asserted in specific circumstances.  See, e.g.,

Cruzan v. Director, Missouri Dep't of Health, 497 U.S. 261 (1990) (recognizing that a competent person has a Fourteenth Amendment liberty interest in refusing medical treatment); Matter of Welfare of Colyer, 660 P.2d 730 (Wash. 1983); In re Conroy, 486 A.2d 1209 (N.J. 1985) (holding that an incompetent, but not necessarily comatose, patient has the right to refuse life-sustaining treatment). Recognizing the issue as a fundamental societal concern, state legislatures have passed laws addressing the right to refuse life-sustaining medical treatment, established procedures for creating and implementing advance directives (i.e. "living wills"), and enabled surrogate decision-makers to exercise authority on another's behalf. See, e.g., N.J.S.A. 26:2H-54a ("New Jersey Advance Directives for Health Care Act"); GA Code Ann. § 31-32-1 ("Georgia Advance Directive for Health Care Act"); Cal. Prob. Code §§ 4600-4660 ("Health Care Decisions Law").

In 1986, the Hawaiʻi legislature followed suit, enacting HRS chapter 327D. 1986 Haw. Sess. Laws. Act 338. This act, among other things, recognized the right to individual autonomy in medical choices and protected medical providers from criminal prosecution. See, e.g., HRS § 327D-1 (1993) ("The legislature finds that all competent persons have the fundamental right to control the decisions relating to their own medical care, including the decision to have medical or surgical means or procedures calculated to prolong their lives provided, continued, withheld, or withdrawn."); id. § 327D-14 ("Death resulting from

28

the withholding or withdrawal of life-sustaining procedures from a patient under this chapter does not, for any purpose, constitute a suicide."); id. § 327D-18 ("In the absence of actual notice of the revocation of a declaration, no health care provider, health care facility, physician, or any other person acting under the direction of an attending physician shall be subject to criminal prosecution . . . as a result of the withholding or the withdrawal of life-sustaining procedures from a patient in accordance with this chapter[.]").

In 1999, the Hawai'i legislature replaced chapter 327D with chapter 327E, the Uniform Health-Care Decisions Act. 1999 Haw. Sess. Laws Act 169. Standing Committee Report No. 1600 from the Senate Committee on the Judiciary stated:

> The purpose of this measure is to enact the Uniform Health-Care Decisions Act.
> Your Committee finds that since the Supreme Court's decision in Cruzan v. Commissioner, Missouri Department of Health, 497 U.S. 261 (1990), significant changes have occurred in state legislation on health care decision making. Nearly all states have statutes authorizing the use of powers of attorney for health care. In addition, a majority of states have statutes allowing family members, and in some cases close friends, to make health care decisions for adult individuals or emancipated minors who lack capacity.
> However, your Committee recognizes that there is a greater need for uniformity among advance directives for health care and believes that this Uniform Health Care Decisions Act will simplify and facilitate the making of advance health care directives. . . . .
> Your Committee intends that this measure replace chapter 327D, Hawaii Revised Statutes, relating to medical treatment decisions which was first enacted in 1986 and has not been revised since 1992. In the intervening years, medical science has advanced tremendously and medical ethics has developed correspondingly. This measure brings medical treatment decisions into today's world of advances in medicine, patient rights, and attitudes toward dying. Your

> Committee notes that this measure is not intended to disrupt the existing surrogate law and practices in acute care and long-term care settings.

S. Stand. Comm. Rep. No. 1600, in 1999 Senate Journal, at 1657.

HRS § 327E-13(b) closely tracks 13(b) of the Uniform Health-Care Decisions Act (1993). See Unif. Health-Care Decisions Act § 13(b) ("Death resulting from the withholding or withdrawal of health care in accordance with this [Act] does not for any purpose constitute a suicide or homicide or legally impair or invalidate a policy of insurance or an annuity providing a death benefit, notwithstanding any term of the policy or annuity to the contrary."). HRS § 327E-13(b) is also substantively the same as other state statutes derived from the uniform law. See, e.g., Cal. Prob. Code § 4656; Me. Rev. Stat. Ann. tit. 5, § 813(b); Miss. Code. Ann. § 41-41-227(2); see also N.M. Stat. Ann. § 24-7A-13(B) ("Death resulting from the withholding or withdrawal of health care in accordance with the Uniform Health-Care Decisions Act does not for any purpose: (1) constitute a suicide, a homicide, or other crime[.]").

In declaring that "[d]eath resulting from the withholding or withdrawal of health care in accordance with this chapter shall not for any purpose constitute a suicide or homicide," HRS § 327E-13(b), the Hawai'i legislature adopted the well-recognized principle that persons properly involved in making and carrying out decisions to terminate life-support, including patients, surrogates, and doctors, should be free of criminal and civil liability for their involvement. See, e.g.,

Matter of Farrell, 529 A.2d 404, 415-16 (N.J. 1987);[11] In re Quinlan, 355 A.2d at 669.  There is no indication in either the language or legislative history of HRS chapter 327E, or in case law related to the right to refuse treatment, that the exercise of this right protects any person from criminal liability.

The statute's language should not be taken out of context; rather, it should be read to protect only those whose

---

[11]    For example, in the New Jersey case Matter of Farrell, the plaintiff petitioned to the New Jersey Chancery Court to be appointed the special medical guardian for his wife, who had amyotrophic lateral sclerosis (more commonly known as Lou Gehrig's disease), and had expressly granted permission to remove a respirator that had been keeping her alive for the past three years.  514 A.2d 1342, 1343 (N.J. Ch. 1986).  The court recognized Mrs. Farrell's right to discontinue this life-sustaining treatment, found that Mrs. Farrell was competent and capable of making this decision, and appointed the plaintiff, her husband, as her guardian ad litem to carry out her wishes.  Id. at 1347.  In addition, the court ordered "that [Mr.] Farrell, or any physician or other person involved in the removal of said respirator from [Mrs.] Farrell pursuant to the terms of this judgment, will be free from any criminal and civil liability."  Id.  In a footnote, the court explained:

> This finding is made in accordance with In The Matter of Quinlan, 70 N.J. 10, 51-52, 355 A.2d 647[, 669] (1976), where the New Jersey Supreme Court stated that upon the termination of life support systems, "the ensuing death would not be homicide but rather expiration from existing natural causes.  Secondly, even if it were to be regarded as homicide, it would not be unlawful."  The Quinlan Court added that there is a "real" and "determinative distinction between the unlawful taking of the life of another and the ending of artificial life support systems as a matter of self-determination."  Id. at 52, 355 A.2d 647.  The Court clearly established that the exercise of this constitutional right is protected from criminal prosecution, which "extends to third parties whose action is necessary to effectuate the exercise of that right."  Ibid.

Id. at 1347 n.3 (emphasis added).

The New Jersey Supreme Court affirmed the chancery court's decision, and, in addition to providing guidance for when a patient requests "the discontinuance of life-sustaining medical treatment," Matter of Farrell, 529 A.2d at 413, it held that "no civil or criminal liability will be incurred by any person who, in good faith reliance on the procedures established in this opinion, withdraws life-sustaining treatment at the request of an informed and competent patient[.]"  Id. at 415-16 (emphasis added).

conduct "in accordance with [chapter 327E]" leads to the patient's death. Chapter 327E specifically enumerates and defines people who are relevant to its provisions. This list includes agents (someone who has "power of attorney for health care to make a health-care decision for the individual granting the power"); guardians ("a judicially appointed guardian having authority to make a health-care decision for an individual"); health-care providers ("an individual licensed, certified, or otherwise authorized or permitted by law to provide health care in the ordinary course of business or practice of a profession"); and others. HRS § 327E-2. Those corresponding people in Higa's life acted "in accordance with" Chapter 327E-2 when they decided to remove his ventilator. HRS § 327E-13(b). Abella, when he allegedly set into motion the events leading to Higa's death, did not.

Accordingly, we hold that HRS § 327E-13(b) does not shield from criminal liability for homicide those actors whose conduct caused another to require life-saving medical intervention if the victim's medical care is subsequently withdrawn, causing death. To hold otherwise would lead to absurdity. Haugen, 104 Hawai'i at 76–77, 85 P.3d at 183–84 ("Every construction which leads to an absurdity shall be rejected.") (citation omitted). Interpreting HRS § 327E-13(b) to apply to any actor would insulate from liability the very person who caused Higa to require life support technology to stay alive. In other words, the legislature could not have intended for a

statute designed to protect an individual's right to bodily autonomy in the age of medical advancement to be used as a shield for a wrongdoer who caused the need for medical intervention in the first place - and did so by severe physical intrusion into someone else's bodily autonomy, the very right enshrined in the statute.

The above analysis supports the conclusion that HRS § 327E-13(b) of the Uniform Health-Care Decisions Act shields family members and medical professionals from criminal liability for death resulting from the withdrawal of medical care, but it does not extend its protections to actors whose conduct rendered medical care necessary in the first instance.  Thus, we hold that HRS § 327E-13(b) does not bar Abella, an actor whom the statute does not contemplate protecting, from being convicted of a homicide.  Therefore, Abella's motion for a judgment of acquittal was properly denied.

**B.    The Circuit Court Should Have Instructed the Jury on Causation Pursuant to HRS §§ 702-215 and 702-216**

We next consider whether Abella was entitled to jury instructions on causation and intervening action under HRS §§ 702-215[12] and 702-216.[13]  We hold that the circuit court

---

[12]    HRS § 702-215 provides:

In the following instances <u>intentionally or knowingly</u> causing a particular result <u>shall be deemed to be established even though the actual result caused by the defendant may not have been within the defendant's intention or contemplation</u>:

(1)    The actual result differs from that intended or
(continued...)

plainly erred by failing to include instructions pursuant to those provisions.

In a jury trial, it is the court's responsibility to ensure that the jury is properly instructed on the law and the questions the jury is to decide.  See Nichols, 111 Hawai'i at 334-35, 141 P.3d at 981-82.  The State must prove "[e]ach element of the offense" beyond a reasonable doubt.  HRS § 701-114. Causation is a question of fact (and an element of the offense of

---

[12](...continued)
>
> contemplated, as the case may be, only in the respect that a different person or different property is injured or affected or that the injury or harm intended or contemplated would have been more serious or more extensive than that caused; or
>
> (2)   The actual result involves the same kind of injury or harm as the intended or contemplated result and is not too remote or accidental in its occurrence or too dependent on another's volitional conduct to have a bearing on the defendant's liability or on the gravity of the defendant's offense.
>
> (Emphasis added.)

[13]   HRS § 702-216 provides:

> In the following instances, recklessly . . . causing a particular result shall be deemed to be established even though the actual result caused by the defendant may not have been within the risk of which the defendant was . . . aware:
>
> (1)   The actual result differs from the probable result only in the respect that a different person or different property is injured or affected or that the probable injury or harm would have been more serious or more extensive than that caused; or
>
> (2)   The actual result involves the same kind of injury or harm as the probable result and is not too remote or accidental in its occurrence or too dependent on another's volitional conduct to have a bearing on the defendant's liability or on the gravity of the defendant's offense.
>
> (Emphasis added.)

34

manslaughter) and is therefore reserved for the jury as fact finder to determine.

The Hawai'i Penal Code addresses causation in HRS §§ 702-214, 702-215, and 702-216, which are derived from the Model Penal Code (MPC) § 2.03.[14] HRS § 702-214 supplies the test

_____

[14] MPC § 2.03 provides:

(1) Conduct is the cause of a result when:

(a) it is an antecedent but for which the result in question would not have occurred; and

(b) the relationship between the conduct and result satisfies any additional causal requirements imposed by the Code or by the law defining the offense.

(2) When purposely or knowingly causing a particular result is an element of an offense, the element is not established if the actual result is not within the purpose or the contemplation of the actor unless:

(a) the actual result differs from that designed or contemplated, as the case may be, only in the respect that a different person or different property is injured or affected or that the injury or harm designed or contemplated would have been more serious or more extensive than that caused; or

(b) the actual result involves the same kind of injury or harm as that designed or contemplated and is not too remote or accidental in its occurrence to have a [just] bearing on the actor's liability or on the gravity of his offense.

(3) When recklessly or negligently causing a particular result is an element of an offense, the element is not established if the actual result is not within the risk of which the actor is aware or, in the case of negligence, of which he should be aware unless:

(a) the actual result differs from the probable result only in the respect that a different person or different property is injured or affected or that the probable injury or harm would have been more serious or more extensive than that caused; or

(b) the actual result involves the same kind of injury or harm as the probable result and is not too remote or accidental in its occurrence to have a [just] bearing on the actor's liability or on the gravity of

(continued...)

for "actual causation" and "is commonly called the 'but for' test." HRS § 702-214 cmt. (2014). Like subsection 1(a) of MPC § 2.03, it provides: "Conduct is the cause of a result when it is an antecedent but for which the result in question would not have occurred." HRS § 702-214. According to the Commentary to this statute, once actual causation is established, "causality in its strict sense is finished and attention must then shift to §§ 702-215 and 216 which deal with the defendant's culpability with respect to the result." HRS § 702-214 cmt. (2014). But:

> The difficulty of the problem of causation does not lie in making a determination of actual causation, but rather in setting the appropriate standard for determining those instances in which the defendant will not be held liable for the result of the defendant's conduct because the defendant did not intend or contemplate the result or was unaware of the risk that it would obtain.

HRS § 702-214 cmt. (2014).

To address that difficulty, the Hawai'i legislature adopted the "culpability" assessment in HRS §§ 702-215 and 216 as the proper inquiry for determining whether it would be unjust to attribute the result that occurred to the defendant's conduct, even if the conduct was a cause-in-fact of that result. See HRS § 702-214 cmt. (2014). This test derives from subsections (2) and (3) of MPC § 2.03, but clarifies the MPC in an important respect: HRS §§ 702-215 and 216 make explicit that "another's

---

[14](...continued)
> his offense.

> (4) When causing a particular result is a material element of an offense for which absolute liability is imposed by law, the element is not established unless the actual result is a probable consequence of the actor's conduct.

volitional conduct" may be a factor to consider in the "culpability" analysis.  See HRS § 702-215 cmt. (2014).[15]  In State v. Pelham, the dissent recognized that Hawai'i and New Jersey are the only two states "that have adopted MPC § 2.03 and explicitly added the intervening volitional conduct of others as a factor to be considered in determining causation."[16]  824 A.2d 1082, 1097 (N.J. 2003) (Albin, J., dissenting)

As noted in the Commentary to the HRS, the "culpability" standard relates to the idea of "proximate cause" in that "culpability" captures when the law will "allow the just imposition of liability" for causing a particular result.  HRS § 702-214 cmt. (2014).  However, the culpability standard

> departs from the common-law concept of 'proximate cause' (at best a poor label for a host of largely unarticulated considerations) and analyzes the question of whether a defendant will be held liable for having caused a particular result not in terms of factual or "scientific" causation (which has to be resolved according to the test set forth in § 702-214) but in terms of those factors which properly bear on the defendant's culpability with respect to a result

---

[15]  The Commentary explains:

The Code follows the Model Penal Code1 as supplemented by the suggestion of Hart and Honore that provisions regarding liability for unintended or uncontemplated results must be separately stated for those instances when the difference in result is due to natural events and those instances when it is due to the volitional conduct of another.  Although the commentary to the Model Penal Code would suggest that volitional conduct of another is adequately covered as a factor which might make the actual result "too remote or accidental," greater clarity is achieved by the language of this Code.

HRS § 702-215 cmt. (2014) (footnotes omitted) (citing H.L.A. Hart & A.M. Honore, Causation in the Law (1959)).

[16]  For this reason, we consider case law from New Jersey interpreting similar causation principles as persuasive authority on these provisions.

> other than one which the defendant intended or contemplated. The factors to be considered are, as stated, whether the actual result is more serious or extensive than the intended or contemplated result and whether the actual result is too remote or accidental in its occurrence or too dependent on another's volitional conduct to have a bearing on defendant's liability (or the gravity of the defendant's offense).

HRS § 702-215 cmt. (2014); see id. § 702-216 cmt. (2014).

The culpability standard for causation comes into play when the actual result can be "contrasted with the designed or contemplated (or in the case of subsection (3), the probable) result in terms of its specific character and manner of occurrence." State v. Martin, 573 A.2d 1359, 1364 (N.J. 1990) (emphasis added) (quoting Model Penal Code and Commentaries § 2.03 comment at 260 n.13 (1985)). Subsection (1) of both HRS §§ 702-215 and 216 refer to differences in the character of the actual result. See, e.g., HRS § 702-215(1) (considering when "a different person or different property is injured or affected" or when the injury or harm is more or less serious than contemplated). Subsection (2) of both statutes refers to differences in the manner of the result's occurrence. See, e.g., HRS § 702-215(2) (considering whether the result is "too remote or accidental in its occurrence" or whether its occurrence is "too dependent on another's volitional conduct").

Specifically, subsection (2) concerns the concept of intervening causation. In a case involving reckless manslaughter, the Supreme Court of New Jersey addressed the concept of intervening causation under N.J.S.A. 2C:2-3(c), a

38

statutory provision that is substantially identical to HRS § 702-216, as follows:

> [W]hen permitted by the law, "'it is for the jury to determine whether intervening causes or unforeseen conditions lead to the conclusion that it is unjust to find that the defendant's conduct is the cause of the actual result.'" Pelham, supra, 176 N.J. at 461, 824 A.2d [at 1089-90] (quoting Martin, supra, 119 N.J. at 13, 573 A.2d [at 1365]).  The Code "does not identify what may be an intervening cause," ibid., but "'deals only with the ultimate criterion by which the significance of such possibilities ought to be judged,'" Martin, supra, 119 N.J. at 13, 573 A.2d [at 1365] (quoting [The New Jersey Penal Code: Final Report of the New Jersey Criminal Law Revision Commission], commentary to § 2C:2-3, at 50).  An "'intervening cause'" occurs when an event "'comes between the initial event in a sequence and the end result, thereby altering the natural course of events that might have connected a wrongful act to an injury.'"  Pelham, supra, 176 N.J. at 461, 824 A.2d [at 1090] (quoting Black's Law Dictionary 212 (7th ed. 1999)).  "Generally, to avoid breaking the chain of causation for criminal liability, a variation between the result intended or risked and the actual result of [the] defendant's conduct must not be so out of the ordinary that it is unfair to hold [the] defendant responsible for that result."  Id. at 461-62, 824 A.2d [at 1090] (citing Martin, supra, 119 N.J. at 14, 573 A.2d [at 1365]; Wayne R. LaFave & Austin W. Scott, Jr., Handbook on Criminal Law § 35, at 246 (1972)).  Thus, an "intervening cause" denotes an event or condition which renders a result "too remote, accidental in its occurrence, or dependent on another's volitional act" to fairly affect criminal liability or the gravity of the offense.  See N.J.S.A. 2C:2-3(c); Pelham, supra, 176 N.J. at 461-62, 824 A.2d [at 1090].

State v. Buckley, 78 A.3d 958, 968 (N.J. 2013).

In the instant case, the circuit court instructed the jury only as to "but for" causation under HRS § 702-214.  At the time, Abella did not request a causation jury instruction based on the culpability standard relating to intervening causation in subsection (2) of HRS §§ 702-215 and -216.  As such, he asks this court to recognize plain error in omitting such an instruction.

He asserts:

> Here, there was an intervening act by numerous persons, other than Abella, i.e., medical treatment, and a decision made that terminated Higa's life. In other words, the result caused was "too remote" or "too dependent on another's volitional conduct to have a bearing on the defendant's liability or on the gravity of the defendant's offense." § 702-215(2), HRS [2014]; see also § 702-216(2), HRS [2014] (reckless or negligent causation).

In this case, the court's instruction on causation was an incomplete and a misleading statement of the law - and thus plain error - because it omitted any reference to the "culpability" standard in HRS §§ 702-215(2) and -216(2). Evidence was adduced at trial of intervening events, from which a jury could have inferred that Abella's culpability was diminished. Specifically, jurors could have considered evidence of Higa's daily improvements after his surgery, showing that Higa could reach toward stimuli and open his eyes in response to voice, that he was becoming more alert, and that his condition was not worsening. Jurors also could have considered Dr. Oshiro's testimony that it was "probably possible" that Higa could have regained independent breathing. Moreover, jurors could have also fairly considered the circumstances surrounding the decision to withdraw Higa's life support, including that Higa's daughter was not informed of the progress he had been making since the surgery.

This evidence could enable a jury to conclude that intervening volitional conduct caused Higa's death such that it would be unjust to convict Abella of a homicide. "When the

actual result is of the same character, but occurred in a different manner from that designed or contemplated, it is for the jury to determine whether intervening causes or unforeseen conditions lead to the conclusion that it is unjust to find that the defendant's conduct is the cause of the actual result." Martin, 573 A.2d at 1365. Indeed, in his closing argument before the jury, defense counsel specifically urged the jurors to draw this conclusion:

> One more thing. Remember I asked the doctor, I said what if you didn't pull the tubes out, would he have survived another day? He said yeah. Would you survive another day? Said yeah. Would you survive another day? Yeah. So they don't really know to this day whether that guy would still be alive and what kind of progress he would have been making over this past year. They really don't know, and they made a judgment call, and in making that judgment call, they want you to hold my client responsible for that, and that's just not right. That's just not right.

In light of the evidence, whether it would be unjust to hold Abella accountable for the result he in fact caused is precisely the inquiry the legislature intended for a jury to consider per subsection (2) of HRS §§ 702-215 and -216. In this instance, by limiting the jurors' understanding of legal causation to the "but for" rule under HRS § 702-214, the circuit court prevented the jurors from meaningfully considering the issue of whether it would be unjust to consider Abella criminally liable for causing Higa's death on July 29, 2014 based on evidence of intervening events. For this reason, the circuit court plainly erred in omitting a jury instruction based on subsection (2) of HRS §§ 702-215 and -216.

41

In reaching this conclusion, we disagree with the ICA's holding that, as a matter of law, removal of life support cannot constitute an intervening cause that may absolve a defendant from liability for causing death.  See Abella, 144 Hawai'i at 148-49, 438 P.3d at 280-81.  Thus, we also disagree with the New Jersey Supreme Court majority in Pelham, relied upon by the ICA.

Pelham is the only case cited by the ICA that is directly relevant to the instant case, given the unique statutory definitions of causation in New Jersey and Hawai'i.[17]  In Pelham,

---

[17]    In addition to Pelham, the ICA cited People v. Bowles, 607 N.W.2d 715 (Mich. 2000), State v. Yates, 824 P.2d 519 (Wash. App. 1992), and People v. Funes, 28 Cal.Rptr.2d 758 (Cal. App. 1994).  See Abella, 114 Hawai'i at 148-49.  The majority in Pelham also favorably cited these cases.  See Pelham, 824 A.2d at 1091-92.  However, the Pelham dissent persuasively observed:

> New Jersey is only one of two states that have adopted MPC § 2.03 and explicitly added the intervening volitional conduct of others as a factor to be considered in determining causation. . . .
> [T]he majority's heavy reliance on other states' common-law proximate causation jurisprudence as support for its position is misplaced.  Not one case cited by the majority interprets a causation provision similar to our own.  Only twelve states have codified general statutory causation provisions.  Three states have adopted the essential elements of MPC § 2.03 verbatim, and do not include N.J.S.A. 2C:2-3's additional requirements that the actual result of a defendant's conduct not be "too . . . dependent on another's volitional act to have a just bearing" on his liability or on the gravity of the offense.  Three states have wholly rejected the MPC causation provision on which ours was patterned and instead rely solely on a draft provision of the Final Report of the National Commission on Reform of Federal Criminal Laws (Brown Commission) that "deals with only one aspect of the traditional problem of causation, indicating that if an act is a but-for' or concurrent cause of a result causation 'may be found.'"  See MPC, supra, § 2.03 cmt. 5 at 264-65 & n. 23.  Two states have adopted provisions incorporating the Brown Commission draft provision, along with provisions analogous to MPC § 2.03(3)(a), supra note 2.6.  Two states have adopted the MPC tentative draft alternative that the ALI ultimately rejected, and thus couch causation culpability in terms of whether the actual result was

(continued...)

the victim suffered "catastrophic injuries" after a car accident, including a spinal column fracture paralyzing him from the chest down, multiple broken ribs, a punctured lung, and head injury, among other things. 824 A.2d at 1084. He required a vena cava filter, a surgical airway through his neck and into his windpipe, a feeding tube inserted directly to his stomach, and a catheter. Id. Despite his brain injuries, he "was aware of his physical and cognitive disabilities" and occasionally "tried to remove his ventilator" during lucid moments. Id. at 1085. About five months after the accident, "[b]ecause of his brain damage, his lack of improvement, and his severe infections[,] [his] family decided to act in accordance with his wishes and remove the ventilator." Id. He was pronounced dead within two hours of the ventilator's removal. Id.

The defendant, who was charged with aggravated manslaughter and convicted of second-degree vehicular homicide, argued on appeal that the trial court committed reversible error in instructing the jury that "the removal of life supports, in this case a ventilator, is not a sufficient intervening cause to

---

[17](...continued)
   "foreseen or foreseeable as a substantial probability." See MPC, supra, § 2.03 cmt. 3 at 261 n. 17. The majority's reliance on other jurisdictions' law of causation is thus not persuasive because those cases do not interpret our unique provision, which explicitly incorporates both the intervening volitional conduct of others and the jury's sense of justice as factors to be considered in determining a defendant's liability.

Id. at 1097, 1099 (Albin, J., dissenting) (footnotes omitted) (emphasis added).

relieve the defendant of criminal liability."  Id. at 1086.  The court of appeals agreed and vacated the conviction, concluding that "the trial judge's instructions on intervening cause deprived defendant of the opportunity to have the jury decide the essential issue of causation."  State v. Pelham, 801 A.2d 448, 456 (N.J. App. 2002).  The court of appeals thus held that the instruction "deprived defendant of his constitutional right to have the jury in a criminal trial to decide all elements of the charged offense."  Id.

On further review, the Supreme Court of New Jersey upheld the conviction.  See Pelham, 824 A.2d at 1092.  The court held that "removal of life support, as a matter of law, may not constitute an independent cause for purposes of lessening a criminal defendant's liability."  Id.  The majority reasoned:

> Removal of life-sustaining treatment is a victim's right.
> It is thus foreseeable that a victim may exercise his or her
> right not to be placed on, or to be removed from, life
> support systems.  Because the exercise of the right does not
> break unexpectedly, or in any extraordinary way, the chain
> of causation that a defendant initiated and that led to the
> need for life support, it is not an intervening cause that
> may be advanced by the defendant.

Id. at 1093.

The court's decision in Pelham turned largely and, in our view, incorrectly, on the importance of upholding a person's right to refuse life-sustaining medical treatment and "the effect to be given to a victim's exercise of that right in the context of a homicide trial."  Id. at 1089.  As the dissent pointed out, Pelham was "not about a patient's right to self-determination"

44

and the majority's ruling, in essence, "conflates the right of the patient to self-determination with the right of the accused to have his case decided by a jury." Id. at 1095-96 (Albin, J., dissenting).

The dissent focused on N.J.S.A. 2C:2-3c, the criminal causation provision patterned on the MPC, which provides for the consideration of whether a result is "too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing on the actor's liability or on the gravity of his offense."[18] Id. at 1095 (Albin, J., dissenting). The dissent observed that this "general and broad language . . . was intended to apply to the infinite number of variables that arise in the unique circumstances of each case, including that of this defendant." Id. (Albin, J., dissenting). The dissent also emphasized, "Causation was a matter that the jury should have been trusted to decide correctly" and that the majority "ignores the statutory language that governs this case[.]" Id. (Albin, J., dissenting). Further, the dissent noted:

> the drafters of our Code clearly contemplated, as previously recognized by this Court, that "[w]hen the actual result is of the same character, but occurred in a different manner . . ., it is for the jury to determine whether intervening causes or unforeseen conditions lead to the conclusion that it is unjust to find that the defendant's conduct is the cause of the actual result." Martin, supra, 119 N.J. at 13, 573 A.2d [at 1366-67] (emphasis added). This is just such a case.
> Here, . . . defendant does not dispute that his

---

[18] Although HRS §§ 702-215(2) and 702-216(2) differ from the New Jersey provision because they do not include the word "just," this does not bear on our analysis.

> conduct was a "but-for" cause of the victim's death. Instead, he claims that the State must prove the additional requirement of N.J.S.A. 2C:2-3c that he recklessly caused the actual result, i.e., the victim's death, five months after the accident and two hours after the victim and his family elected to disconnect his ventilator.  In order for this defendant to be guilty of vehicular homicide, the State must prove that the specific character and manner of the victim's death was either: (1) within the risk of which defendant was aware; or, (2) if not, then not "too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing" on defendant's liability or the gravity of his offense.  N.J.S.A. 2C:2-3c; Martin, supra, 119 N.J. at 12, 573 A.2d [at 1364].

Id. at 1098 (Albin, J., dissenting) (emphasis in original).

We adopt the reasoning of the dissent in Pelham.  To hold as a matter of law that the removal of life support cannot constitute an intervening cause ruling interferes with the role of the jury in finding the essential element of causation.  See id. at 1098 (Albin, J., dissenting) ("The majority holds, in essence, that the risk that a victim will elect to reject or terminate some life-sustaining measure as a result of his injuries is, as a matter of law, within the risk of which defendants are aware.  I part with the majority on this point.  Whether defendant was aware of the risk was a question for the jury.").  Moreover, we agree that

> [i]n making no allowance for the varied circumstances in which life support may be terminated by a victim, the majority does not permit the jury to consider the level of medical assistance required to sustain life, for example, whether the medical regimen is so burdensome as to deny even a minimal quality of life, or is relatively benign in comparison.  The nature and scope of the medical care and the quality of life of the victim are factors that should be considered along with remoteness in determining whether intervening circumstances — the voluntary termination of life support — should have a just bearing on the outcome of the case.

46

Id. at 1100 (Albin, J., dissenting).

In adopting this analysis, we in no way diminish the importance of the right to refuse medical treatment as provided in Chapter 327E. However, we cannot infringe on a defendant's right in a criminal case to have the jury determine causation, an element of the crime, beyond a reasonable doubt. The choices of patients or their families do not affect that right. This is particularly so when, as was the case here, there was evidence suggesting that the prognosis for the victim was uncertain at the time the life support was discontinued. We at once respect the difficult, highly personal, and protected decision made by Higa's family while recognizing our responsibility to ensure that Abella receives a fundamentally fair trial.[19]

For the above reasons, we hold that the trial court should have instructed the jury on intervening causation pursuant to HRS §§ 702-215 and 702-216, and its failure to do so was "prejudicially insufficient," requiring a new trial. Nichols, 111 Hawai'i at 334, 141 P.3d at 981.[20]

### IV. CONCLUSION

For the foregoing reasons, we vacate the ICA's May 7,

---

[19]     We note that on remand, a jury might well come to the same verdict, and nothing in this decision should be read to foreclose that possibility. But that must be a decision left to the jury. Pelham, 824 A.2d at 1100 (Albin, J., dissenting).

[20]     The circuit court should be mindful of administering jury instructions consistent with this opinion such that the jury is informed whether the causation instructions discussed herein apply to a lesser-included offense.

47

2019 judgment on appeal and vacate the circuit court's

December 16, 2015 judgment of conviction.  The case is remanded

to the circuit court for proceedings consistent with this

opinion.

Dana S. Ishibashi             /s/ Mark E. Recktenwald
for petitioner
                              /s/ Paula A. Nakayama

Chad M. Kumagai               /s/ Sabrina S. McKenna
(Brandon H. Ito
on the brief)                 /s/ Richard W. Pollack
for respondent
                              /s/ Michael D. Wilson

