**Electronically Filed
Supreme Court
SCWC-18-0000940
15-MAR-2023
07:58 AM
Dkt. 20 OPA**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellee,

vs.

AIVEN ANGEI,
Petitioner/Defendant-Appellant.

SCWC-18-0000940

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-18-0000940; CR. NO. 1CPC-18-0000163)

MARCH 15, 2023

RECKTENWALD, C.J., NAKAYAMA, AND McKENNA, JJ.,
AND CIRCUIT JUDGE TO'OTO'O, ASSIGNED BY REASON OF VACANCY,
WITH WILSON, J., CONCURRING AND DISSENTING

OPINION OF THE COURT BY RECKTENWALD, C.J.

## I.    INTRODUCTION

This case requires us to consider the application of Hawai'i Revised Statutes (HRS) § 327C-1 (2010) to a prosecution for murder.  We also consider whether the trial court erred in declining to instruct the jury on Reckless Endangering in the

Second Degree (Reckless Endangering Second) as an included offense.

Aiven Angei was charged with Murder in the Second Degree after an altercation with Jonathan Makana Kanui-Flores that ended with Kanui-Flores being stabbed multiple times. A jury in the Circuit Court of the First Circuit (circuit court) found Angei guilty of the lesser included offense of Manslaughter based on reckless conduct (Reckless Manslaughter), and the Intermediate Court of Appeals (ICA) affirmed the conviction.

Angei argues that the requirements of HRS § 327C-1 apply to all criminal cases involving death, including his case. We disagree. As we held in State v. Moon, No. SCAP-19-714, 2023 WL 1878104 (Haw. Feb. 10, 2023), as corrected (Feb. 17, 2023), this statute applies in cases where a death determination – that is, where a "generally medically recognized criteria of determining the occurrence of death" – is required or implicated. Id. at *1. Here, a death determination was neither required nor implicated because the State and Angei stipulated that Kanui-Flores was declared brain dead and cardiac dead, and that Kanui-Flores was approved for organ donation. Moreover, the medical examiner opined that Kanui-Flores died as result of a stab wound that penetrated his skull and entered his brain. Thus, there was sufficient evidence for a reasonable juror to conclude that

death was proven beyond a reasonable doubt.  Accordingly, the circuit court did not err in denying Angei's motion for judgment of acquittal.

Angei also contends that the circuit court erred in failing to instruct the jury on the lesser included offense of Reckless Endangering Second.  We disagree.  As set forth below, there was no rational basis in the evidence to instruct the jury on that offense, and even if the circuit court did somehow err, any such error was harmless beyond a reasonable doubt.

We accordingly affirm the ICA's October 5, 2020 Judgment on Appeal, which affirmed the circuit court's November 20, 2018 Judgment of Conviction and Sentence.

## II.  BACKGROUND

### A.  Circuit Court Proceedings[1]

A grand jury indicted Angei for Murder in the Second Degree in violation of HRS § 707-701.5 (2014).[2]  The testimony of several of the main witnesses is summarized below.[3]

---

[1]     The Honorable Rom A. Trader presided.

[2]     HRS § 707-701.5 provides:

> **Murder in the second degree.**  (1) Except as provided in section 707-701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.
>      (2) Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706-656.

[3]     The other evidence included surveillance footage, and DNA evidence that linked Angei to a cap and slippers found at the scene.

3

Michael Magbaleta stated that on January 28, 2018 at 2:30 a.m., a man approached him near a 7-Eleven in Waipahu asking "to buy pakalolo."[4]  Magbaleta told the man that he "d[idn't] use that" and "to go away."  The man then walked toward the 7-Eleven and approached two individuals who had exited.  Magbaleta testified that he had seen the man "[p]lenty times," "almost . . . daily," and identified the man as Angei.  Magbaleta testified that he heard Angei asking the two customers "to buy a pakalolo again."  The customers yelled at Angei, telling him "to go away, and then suddenly, they start[ed] fighting."  Magbaleta observed Angei and one of the customers "punching each other"; the other customer stood on the side watching.  The fight was "fast" and after it was over, Magbaleta saw Angei run away.  Magbaleta testified that he heard the customer who had watched the fight ask the other customer if he was okay and call 911, and Magbaleta saw the ambulance arrive.  The next day, a detective approached Magbaleta about the incident, and he told the detective what he had observed and participated in a field lineup where he identified Angei.

Syres Kauai testified that, on the morning of January 28, 2018, he and his friend, Kanui-Flores, went to 7-Eleven in Waipahu to buy food and cigarettes after drinking at a club.

---

[4]     "Pakalolo" is the Hawaiian word for marijuana.  Mary Kawena Pukui & Samuel H. Elbert, Hawaiian Dictionary 304 (2d ed. 1986).

4

After making their purchases, they exited 7-Eleven and were approached by a Micronesian man in his early- or mid-twenties, who asked Kauai to buy marijuana. Kauai told the man to "get out of here, do I look like I sell weed?" The man responded by mumbling and approaching Kauai with his left hand in his pocket. Kauai then told the man to "get the fuck out of here, I don't -- I don't sell weed" and to "beat it" a few times, but the man continued mumbling and staring at Kauai. Kanui-Flores then approached the man, saying, "did you hear what my friend said, he said for [you to] beat it, and shoved the guy."[5] The man stumbled, dropping his backpack, and then got up with a knife – which Kauai thought might be a four-inch switchblade – in his hand.

According to Kauai, the man and Kanui-Flores then went into the parking lot of 7-Eleven and started exchanging blows "one for one." During the fight, the man stabbed Kanui-Flores. Kauai watched the fight from eight feet away and called the police. When Kauai yelled for the man and Kanui-Flores to stop, the men separated, and the man grabbed his backpack and ran. Kauai identified the man in the altercation as Angei.

Kanui-Flores "was kind of in a daze," and Kauai brought him to the sidewalk. After seeing blood coming from

---

[5]    On cross-examination, Kauai acknowledged that he had told police that Kanui-Flores had hit Angei approximately ten times.

Kanui-Flores's head and the back of his right shoulder, Kauai realized that Kanui-Flores was seriously injured. Kauai called for an ambulance and tried to "plug . . . the stab wounds" and keep Kanui-Flores awake until the ambulance arrived. He also gave a police officer a description of the suspect.

Honolulu Police Department (HPD) Officer Ryan Seto responded to the incident. He testified that when he arrived at the scene he saw two men outside 7-Eleven. He verbally identified the person lying on the ground as Kanui-Flores, and the person tending to Kanui-Flores as Kauai. Officer Seto received a description of the suspect from Kauai: "[a] Micronesian male wearing long sleeves, a black hat, slippers, and backpack." Officer Seto relayed this description to other officers in the area over the police radio, but they could not locate the suspect.[6]

HPD Officer Che-Wai Lau testified that on January 28, 2018 at 2:55 a.m., he was dispatched to the Queen's Medical Center where he observed Kanui-Flores "being worked on by the hospital personnel for various injuries." Officer Lau testified that Kanui-Flores's "eyes, even though they were open, they were

---

[6] Officers eventually detained Angei on January 29, 2018. He had a backpack, cell phone, earphones, a hat, and slippers. Officers then created a field lineup and drove Magbaleta to their lineup to see if he recognized Angei. Magbaleta identified Angei as the man involved in the fight the previous day, and Angei was arrested.

just gazing out into seemingly nowhere, essentially." Kanui-Flores appeared unable to communicate. On cross-examination, Officer Lau testified that he "believe[d]" Kanui-Flores was still alive when he went into the room where hospital personnel were treating him, but he only stayed in the room "a few minutes at the most."

Kauai testified that he did not see Kanui-Flores the night Kanui-Flores went to the hospital. When Kauai went to the hospital to visit Kanui-Flores, he saw Kanui-Flores's family and "found out they were going to pull the plug." He had a chance to see Kanui-Flores "before his family decided to pull the plug."[7]

Both the State and Angei stipulated to the following written statement, which was read to the jury:

> It is hereby stipulated and agreed by and between the State of Hawai'i and the defendant that the following facts may be admitted into evidence:
>
> 1. Cherylee Chang, M.D. is a medical doctor who is licensed to practice medicine in the State of Hawai'i.
>
> Dr. Chang's license was valid on January 29, 2018.
>
> Dr. Chang is qualified to determine whether a person is deceased.
>
> 2. On January 29, 2018, at approximately 8:15 a.m., Dr. Chang made a brain death pronouncement for Jonathan

---

[7] The exact timing of Kauai's visit is not clear from the record. Kauai testified that he visited when Kanui-Flores's family was "just about to pull the plug." Since Kauai did not go to the hospital on the night Kanui-Flores was admitted (which was around 3 a.m. on January 28), the visit would have occurred between the morning of January 28 and 11:53 a.m. on January 29, when Kanui-Flores was declared dead.

Makana Kanui-Flores at Queen's Medical Center.

3. An apnea test was performed on January 29, 2018, at approximately 11:53 a.m. by Dr. Chang, which was listed as the time of death.

4. On January 29, 2018, at approximately 5:00 p.m., investigator Casey Nuesca responded to Queen's Medical Center to evaluate the decedent's body.

Dr. Masahiko Kobayashi approved organ donation.

The decedent's body was left in the NICU (sic), and kept on ventilator awaiting organ donation performed by Legacy of Life Hawai'i.

And on January 29, 2018, at approximately 11:53 a.m., Alice Kanui-Flores was notified by staff of John Kanui-Flores and identified the body.

On January 30, 2018, at approximately 5:56 p.m., the body was transferred to the Queen's Medical Center operating room. Dr. Jacqueline Lee pronounced the decedent cardiac dead prior to organ donation.

7. On January 30, 2018, at approximately 8:25 p.m., medical examiner investigator Casey Nuesca secured Jonathan Makana Kanui-Flores's body in a blue body bag and sealed the bag with lock No. 13032.

This was done in the presence of HPD Officer Steven Lee.

8. Jonathan Makana Kanui-Flores's body arrived at the City and County of Honolulu morgue on January 30, 2018, at approximately 8:50 p.m. without incident or mishap.

The body was placed into crypt No. 5 for refrigeration and locked by investigator Casey Nuesca in presence of APT transporter J. Naki.[8]

Dr. Christopher Happy, Chief Medical Examiner for the City and County of Honolulu, testified that Kanui-Flores was "pronounced dead" on January 29, 2018 at Queen's Medical Center by Dr. Chang. Two days later, he performed an autopsy on Kanui-

---

[8] The numbering of the statements in the stipulation as read to the jury skips from 4 to 7, omitting 5 and 6. There are minor non-substantive differences between the written stipulation and what was read to the jury.

Flores.  He described various injuries to Kanui-Flores's body.

The wounds included "a penetrating stab wound of the left temple," in which "the knife went through his skull" and into the brain to a depth of an inch to an inch and a half. They also included "an incised wound of the lateral left neck," "two incised wounds of the left and right shoulders," "a perforating stab wound of the left shoulder," "a penetrating stab wound of the left superior shoulder," "an incised wound of the left lateral chest or flank area," "an incised wound[] of . . . the palm side -- of the left wrist," and a blunt force injury (i.e., a bruise or contusion) on the back of the left hand.[9]  He testified that the "penetrating stab wound" to Kanui-Flores's left temple was "a fatal wound."  Based on his autopsy and the investigative and historical information available to him, Dr. Happy concluded that the cause of Kanui-Flores's death was "stab wounds of the head and torso."

On cross-examination, Angei's attorney did not question Dr. Happy about the cause of Kanui-Flores's death. Instead, his questions focused on Kanui-Flores's blood-alcohol content, how many of Kanui-Flores's wounds were "puncture-type wounds" as opposed to scratches, and whether Dr. Happy saw

_____

[9]  Dr. Happy explained that a stab wound is "a sharp force injury that is deeper than it is long on the skin," and an incised wound is an injury that is "longer than it is deep on the skin."  While a penetrating wound "go[es] into" something, a "perforating" wound "go[es] through" it.

documentation of the organs Kanui-Flores had donated.

After the State rested, Angei moved for judgment of acquittal, arguing that "the State ha[d not] proven beyond a reasonable doubt that Mr. Flores's death was in accordance with the laws . . . of this State." According to Angei, when a person is on artificial means of support for the purposes of organ removal, HRS § 327C-1 required that "two physicians" with certain credentials "come to the conclusion that cessation of all functions of the entire brain, including the brainstem, has occurred." This conclusion must be made before the removal of artificial support, and "both of these doctors need to submit a written statement for the record" of their conclusion.

According to Angei, under HRS § 327C-1, these requirements apply to "all deaths under the circumstances that [HRS § 327C-1] describes" and, thus, applied here. But the State failed to meet these requirements. One doctor testified that Kanui-Flores "was brain dead," and the other that "it was cardiac failure." Neither "determined that the brain . . . , including the brainstem, had ceased to function. . . ." Moreover, there was "no testimony" of these pronouncements of death or that they had occurred before Kanui-Flores was taken off life support.[10] Angei further argued, "we don't have any

_____

[10]    In his motion for judgment of acquittal, Angei also argued that there was "some evidence, not very much, that . . . somebody was appointed a
(. . . continued)

10

testimony or evidence relating to [Kanui-Flores's] actual condition at the time when they decide to harvest his organs", and that it was the State's burden – not Angei's – to produce such evidence.

The State argued that the requirements under HRS § 327C-1 are "safeguards in place by law" for organ donations, but they do not "have any effect on the State's proving the elements at least to a prima facie case that this defendant caused the death of Jonathan Kanui-Flores." Moreover, the State contended it had presented evidence through the stipulation that Kanui-Flores was declared brain dead and approved for organ donation, and this was enough to make a prima facie case.

Angei moved for a judgment of acquittal and filed a memorandum of law in support. In addition to reiterating earlier arguments, Angei argued that the State "ha[d] not prove[n] beyond a reasonable doubt that [he was] the cause of [Kanui-Flores's] death":[11]

> The decedent Jonathan Makana Kanui-Flores was alive when placed in the custody of the Queen's Medical Center on January 28, 2018.

---

(continued . . .)
surrogate to make a decision to pull the plug" on Kanui-Flores. In such situations, HRS Chapter 327E requires that "[c]ertain tasks . . . occur"; there was no evidence that such tasks occurred here. Moreover, pursuant to HRS § 327E-13 (2010), the death here should not be considered a homicide.

[11] Angei's Memorandum of Law in Support of Judgment of Acquittal also contained arguments that the State failed to meet the requirements under HRS Chapter 327E.

11

> Aiven Angei did not have a hand in the intentional or knowing cause of the death, i.e., the homicide of Jonathan Makana Kanui-Flores for which he is charged.
>
> Rather than keeping the decedent "alive", a decision was made to "pull the plug" by the family as testified to by Syres Kauai. No other evidence contradicts this evidence. Christopher Happy, the medical examiner, testified about the "harvesting" of Kanui-Flores' organs, which was done, resulting in his death. Happy was not in a position to determine with [sic] Kanui-Flores was brain dead.

The court denied the motion. The court considered HRS §§ 701-114 (2014)[12] and 701-117 (2014),[13] and Hawai'i Rules of Evidence (HRE) Rule 306(b) (2018)(last amended 1980).[14] It then concluded that the State had established a prima facie case for each material element of the offense of murder. Based on the evidence presented at trial (specifically, the stipulation regarding Kanui-Flores's brain death and cardiac death), the

---

[12] HRS § 701-114 states:

**Proof beyond a reasonable doubt.** (1) Except as otherwise provided in section 701-115, no person may be convicted of an offense unless the following are proved beyond a reasonable doubt:
  (a)  Each element of the offense;
  (b)  The state of mind required to establish each element of the offense;
  (c)  Facts establishing jurisdiction;
  (d)  Facts establishing venue; and
  (e)  Facts establishing that the offense was committed within the time period specified in section 701-108.
  (2)  In the absence of the proof required by subsection (1), the innocence of the defendant is presumed.

[13] HRS § 701-117 states: "Prima facie evidence of a fact is evidence which, if accepted in its entirety by the trier of fact, is sufficient to prove the fact. Prima facie evidence provisions in this Code are governed by section 626-1, rule 306."

[14] HRE Rule 306(b) states: "**Presumptions against the State.** Except as otherwise provided by statute, in criminal proceedings, presumptions against the State, recognized at common law or created by statute, impose on the State either (1) the burden of producing evidence, or (2) the burden of proof."

court found that "there is sufficient evidence for a reasonable juror to conclude that death has been proven beyond a reasonable doubt."  The court further explained that even if HRS § 327C-1 applied and was violated, there was no "authority" to indicate the consequence of this violation.  Absent such an authority, the court concluded it was "not authorized by law" to penalize the State.

Angei submitted a proposed jury instruction on Reckless Endangering Second as a lesser included offense of Murder in the Second Degree.  Angei argued,

> I think this could comport with the conduct of my client, and therefore I think it's consistent with any evidence standard of what he did or didn't do which would permit this instruction to be given, that is, engaged in reckless behavior which created a risk of danger or danger of death — put a person in danger of death or serious bodily injury, so I think that that is — comports with the facts in this case.

The State objected, and the court refused the instruction over Angei's objection.[15]

Angei testified in his own defense that on January 28, 2018, at 2:30 a.m., he was at home babysitting his sister's child; thus, he was not the person involved in Kanui-Flores's death.  On cross-examination, he testified that his residence was not very far from where officers stopped him.  He admitted to seeing Magbaleta "a few times."  But he insisted that he was

---

[15]    Neither party proposed, nor did the court give, a jury instruction that defined death.

13

not the man in HPD's pictures of the possible suspect. He also testified that he had never seen nor touched the cap or slippers recovered at the scene; neither were his. When asked if he had any injuries when he was arrested on January 29, he responded, "I didn't sustain any injury."

The defense then rested, and Angei renewed his motion for judgment of acquittal. The court denied the renewed motion.

The court instructed the jury on Murder in the Second Degree and the following lesser included offenses: Manslaughter (Recklessly Causing Death), Assault in the First Degree, Assault in the Second Degree (Serious Bodily Injury or Substantial Bodily Injury), and Assault in the Third Degree. The jury was also instructed on the following defenses: mutual consent as a defense for Assault in the Third Degree, and self-defense as a defense for Murder in the Second Degree and its lesser included offenses.

During the State's closing, the State argued that "all the evidence, the witnesses, the scientific evidence, physical evidence, video evidence, all point to one person in this case." The State argued that it had carried its burden of proof as to the two substantive elements of Second Degree Murder – "Did [the] defendant intentionally or knowingly engage in conduct" and "[b]y engaging in that conduct did he intentionally or knowingly cause the death of another person." The State concluded that

the jury should find Angei guilty as charged of Second Degree Murder.

In turn, Angei's closing argued that "there are several ways to look at the evidence that was produced." First, Angei noted that "despite what the evidence may show, or some of the evidence may show, there is some evidence that could be interpreted to show that in fact it wasn't him." Even if it was him, Angei argued that the State had failed to prove intent, asserting that "[j]ust because the guy died, it doesn't mean what force he used was deadly. It was self-protective force." Angei contended that the assailant's conduct "was reasonable because of how it ended," noting that "when [Syres] said stop, he stopped." "He didn't go up to him and stab[] him more, or turn around and try and stab Syres."

The jury found Angei guilty of the lesser included offense of Manslaughter (Recklessly Causing Death) in violation of HRS § 707-702(1)(a) (2014).[16] He was sentenced to twenty years of imprisonment. Angei timely filed a notice of appeal.

## B. ICA Proceedings

On appeal, Angei argued that the circuit court erred in two respects: (1) by not instructing the jury on the lesser

---

[16] HRS § 707-702(1)(a) states: "A person commits the offense of manslaughter if: (a) The person recklessly causes the death of another person . . . ."

15

included offense of Reckless Endangering Second under HRS § 707-714(1)(a) (2014)[17] and (2) by denying his motion for judgment of acquittal despite the State's failure to meet the requirements of HRS § 327(c)(1).

First, Angei argued that Reckless Endangering Second is a lesser included offense of Murder in the Second Degree. Under HRS § 701-109(4)(c) (2014), a lesser included offense "differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest or a different state of mind indicating lesser degree of culpability suffices to establish its commission." Angei contended that these requirements were met here because Reckless Endangering Second entails recklessly placing another person in danger of death. "Hence, reckless endangering in the second degree 'differs' by having . . . a lesser state of mind requirement from murder, the offense charged."

Angei then argued that the jury should have been instructed on Reckless Endangering Second because there was a "rational basis" in the evidence for the jury to acquit Angei of Murder in the Second Degree and convict him of Reckless

---

[17] HRS § 707-714(1)(a) states: "A person commits the offense of reckless endangering in the second degree if the person: (a) Engages in conduct that recklessly places another person in danger of death or serious bodily injury . . . ."

16

Endangering Second instead. "The facts show that the decedent was the aggressor and that [Angei] was struck at least 10 times prior to bring[ing] his knife out, which was used after being struck on each time [thereafter]." Angei moreover argued that by convicting him of Reckless Manslaughter instead of Murder in the Second Degree, "the jury did not find that pulling out a knife and using it was an intentional or knowing act that resulted in Kanui-Flores'[s] death."

Second, Angei argued that that State did "not [meet] its burden of proof regarding Kanui-Flores['s] cause of death." Angei argued that under the plain and unambiguous language of HRS § 327C-1, the requirements of that statute applied to this case, "a 'criminal action.'" Angei noted that:

> In this case, two doctors licensed to practice medicine made pronouncements regarding Kanui-Flores'[s] death. Neither are described [in the parties' written stipulation] as an 'attending physician' or an 'osteopathic physician.' While Dr. Chang made a brain death pronouncement, Dr. Lee pronounced Kanui-Flores 'cardiac dead.' Their pronouncements were not memorialized by signed statements as required by statute.

(Citations omitted.)

Since "[t]he State did not present evidence that comports with the requirements of HRS Chapter 327C," the State did not satisfy its burden of proof.

In a Summary Disposition Order, the ICA affirmed the circuit court's judgment. Regarding the jury instruction, the ICA first concluded that, "[c]onsidering all factors," Reckless Endangering Second is a lesser included offense of Murder in the

17

Second Degree. The ICA then considered "whether there was a rational basis in the evidence in this case to support an instruction on the lesser included offense of Reckless Endangering in the Second Degree." Analogizing to its decision in State v. Magbulos, 141 Hawai'i 483, 413 P.3d 387 (App. 2018), the ICA determined that there was "no reasonable possibility that the circuit court's failure to instruct on Reckless Endangering in the Second Degree affected the outcome of this case." The ICA explained:

> As in Magbulos, the jury was not faced with an "all or nothing" choice between the guilty verdict and a "complete acquittal" because the jury had the option of finding Angei guilty of lesser included offenses extending to multiple levels below the charged offense, but chose instead to find him guilty of Reckless Manslaughter. It "strains credulity" to believe that the jury who found Angei guilty of Reckless Manslaughter and rejected finding him guilty of any of the lesser included offenses of first-, second-, and third-degree assault, might reasonably have found him guilty of the lower-level offense of Reckless Endangering in the Second Degree if instructed on this offense.

(Quoting Magbulos, 141 Hawai'i at 499, 413 P.3d at 403.)[18]

Second, the ICA concluded that the circuit court did not err in denying Angei's motion for judgment of acquittal. The ICA reasoned that there was no merit to Angei's argument:

> [N]owhere in the statute or the chapter in which it appears does it describe any consequences for a failure to comply with its outlined procedure for the determination of death, and what effect, if any, any such violation may have on criminal proceedings involving an individual's death. Neither the statute nor the chapter in which it appears requires compliance with the procedure in proving the death

--------

[18] The ICA relied solely on the Magbulos analysis and did not consider whether there was an evidentiary basis that would support the instruction for Reckless Endangering Second.

of an individual for the purpose of proving an element of a criminal offense. There is no requirement that the State prove compliance with HRS chapter 327C in order to make a prima facie case of a decedent's death as an element of an offense for which a defendant is on trial.

Instead, the ICA held that there was sufficient evidence in the record to support a prima facie case, specifically that "Angei caused the decedent's death."

## C.    Supreme Court Proceedings

Angei's application for writ of certiorari presents two questions: (1) whether the ICA gravely erred by not finding that the trial court erred by not instructing the jury regarding Reckless Endangering Second, and (2) whether the ICA gravely erred in affirming the trial court's denial of Angei's motion for judgment of acquittal.

### III.    STANDARDS OF REVIEW

## A.    Jury Instructions

This court has held that "[w]hen jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent or misleading." State v. Pecpec, 127 Hawai'i 20, 32, 276 P.3d 589, 601 (2012).

"[J]ury instructions on lesser-included offenses must be given where there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and

convicting the defendant of the included offense." State v. Flores, 131 Hawai'i 43, 51, 314 P.3d 120, 128 (2013) (citing State v. Stenger, 122 Hawai'i 271, 296, 226 P.3d 441, 466 (2010)).

## B.    Statutory Interpretation

"Questions of statutory interpretation are questions of law to be reviewed de novo under the right/wrong standard." Nakamoto v. Kawauchi, 142 Hawai'i 259, 268, 418 P.3d 600, 609 (2018).

## C.    Motion for Judgment of Acquittal

> When reviewing a motion for judgment of acquittal, we employ the same standard that a trial court applies to such a motion, namely, whether, upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the trier of fact, the evidence is sufficient to support a prima facie case so that a reasonable mind might fairly conclude guilt beyond a reasonable doubt. Sufficient evidence to support a prima facie case requires "substantial evidence" as to every material element of the offense charged. State v. Eastman, 81 Hawai'i 131, 135, 913 P.2d 57, 61 (1996). "Substantial evidence" as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. Id. Under such a review, we give "full play to the right of the fact finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact." State v. Yabusaki, 58 Haw. 404, 411, 570 P.2d 844, 848 (1977).

State v. Jhun, 83 Hawai'i 472, 481, 927 P.2d 1355, 1364 (1996) (Citation omitted).

## IV.    DISCUSSION

## A.    The Circuit Court Properly Denied Angei's Motion for Judgment of Acquittal because HRS § 327C-1 Does Not Apply to the Circumstances of this Case

Angei argues that he was entitled to a judgment of

20

acquittal because the State failed to prove the element of death

in conformity with HRS § 327C-1.[19]  Angei bases his argument on

---

[19]     HRS § 327C-1 states:

> **Determination of death.** (a) Except as provided in subsection (b), a person shall be considered dead if, in the announced opinion of a physician or osteopathic physician licensed under part I of chapter 453, physician or osteopathic physician excepted from licensure by section 453-2(b)(3), physician assistant licensed under chapter 453, or registered nurse licensed under chapter 457, based on ordinary standards of current medical practice, the person has experienced irreversible cessation of spontaneous respiratory and circulatory functions.  Death will have occurred at the time when the irreversible cessation of the functions first coincided.
>      (b) In the event that artificial means of support preclude a determination that respiratory and circulatory functions have ceased, a person shall be considered dead if, in the opinion of an attending physician or osteopathic physician licensed under part I of chapter 453, or attending physician or osteopathic physician excepted from licensure by section 453-2(b)(3), and of a consulting physician or osteopathic physician licensed under part I of chapter 453, or consulting physician or osteopathic physician excepted from licensure by section 453-2(b)(3), based on ordinary standards of current medical practice, the person has experienced irreversible cessation of all functions of the entire brain, including the brain stem.  The opinions of the physicians or osteopathic physicians shall be evidenced by signed statements.  Death will have occurred at the time when the irreversible cessation of all functions of the entire brain, including the brain stem, first occurred.  Death shall be pronounced before artificial means of support are withdrawn and before any vital organ is removed for purposes of transplantation.
>      (c) When a part of a donor is used for direct organ transplantation under chapter 327, and the donor's death is established by determining that the donor experienced irreversible cessation of all functions of the entire brain, including the brain stem, the determination shall only be made under subsection (b).  The determination of death in all other cases shall be made under subsection (a).  The physicians or osteopathic physicians making the determination of death shall not participate in the procedures for removing or transplanting a part, or in the care of any recipient.
>      (d) All death determinations in the State shall be made pursuant to this section and shall apply to all purposes, including but not limited to civil and criminal actions, any laws to the contrary notwithstanding; provided that presumptive deaths under the Uniform Probate Code

(. . . continued)

the plain language of HRS § 327C-1(d), which states that HRS §

327C-1 applies to "all purposes" in "criminal actions, any laws

to the contrary notwithstanding." Angei interprets this to mean

that HRS § 327C-1 applies "to all criminal cases involving

death," including his case.

We disagree. In our recent decision in Moon, 2023 WL

1878104, at *7, we held:

> Under the plain language of HRS § 327C-1, specifically the
> title and subsection (d), this statute applies to
> "[d]etermination[s] of death" or "death determinations."
> While these terms, viewed in isolation, could apply to all
> criminal cases involving death, when viewed in context, it
> is clear they are terms of art intended to apply to more
> limited circumstances where the exact time or occurrence of
> death is necessarily at issue or undetermined.

Here, such a death determination was not necessary;

"viewing the evidence in the light most favorable to the

prosecution and in full recognition of the province of the trier

of fact," there was substantial evidence to support a prima

facie case of death. Jhun, 83 Hawai'i at 483, 927 P.2d at 1366.

Kauai, the decedent's friend, testified that Angei used a four-

---

(continued . . .)
shall not be affected by this section.
(e) The director of health may convene in every odd-numbered year, a committee which shall be composed of representatives of appropriate general and specialized medical professional organizations, licensed attorneys, and members of the public. The committee shall review medical practice, legal developments, and other appropriate matters to determine the continuing viability of this section, and shall submit a report of its findings and recommendations to the legislature, prior to the convening of the regular session held in each even-numbered year.

(Emphasis added.)

inch switchblade to stab the decedent multiple times as the two exchanged blows. When the fight ended and Angei fled, Kauai approached the decedent and observed stab wounds in Kanui-Flores's head and right shoulder. As to the events that followed, the parties stipulated that on January 29, 2018, Dr. Chang pronounced the decedent brain dead, and Dr. Lee pronounced him cardiac dead the following day. Dr. Happy, the chief medical examiner for the City and County of Honolulu who conducted the decedent's autopsy, also testified that the "penetrating stab wound" to Kanui-Flores's left temple was "a fatal wound," and that the cause of Kanui-Flores's death was "stab wounds of the head and torso." Thus, there was sufficient evidence in the record to support the jury finding that Kanui-Flores was dead.

Angei nevertheless raises an issue as to causation, first by suggesting that "the 'harvesting' of Kanui-Flores'[s] organs . . . result[ed] in his death," then by arguing that the jury should have been instructed on causation at trial. Causation becomes an issue if there is evidence that such a decision by a family member or a physician may have caused the death of the decedent. See State v. Abella, 145 Hawaiʻi 541, 558, 454 P.3d 482, 499 (2019). In Abella, for instance, we held that jury instructions on causation and intervening actions were warranted in light of "evidence suggesting that the prognosis

for the victim was uncertain at the time the life support was discontinued." Id. at 561, 454 P.3d at 502.

The defendant in Abella was convicted of manslaughter after he severely beat the decedent. Id. at 543, 454 P.3d at 484. The decedent was in a comatose state for more than a week before he was removed from life support and declared dead. Id. The following evidence of an intervening cause of the decedent's death (i.e., the removal of life support) was adduced at trial: "evidence of [the decedent's] daily improvements after his surgery, showing that [the decedent] could reach toward stimuli and open his eyes in response to voice, that he was becoming more alert, and that his condition was not worsening"; "[the treating neurosurgeon's] testimony that it was 'probably possible' that [the decedent] could have regained independent breathing"; and "the circumstances surrounding the decision to withdraw [the decedent's] life support, including that [the decedent's] daughter was not informed of the progress he had been making since the surgery." Id. at 558, 454 P.3d at 499. Defense counsel even urged the jury to consider the effect of the intervening acts on the defendant's culpability in his closing argument:

> One more thing. Remember I asked the doctor, I said what
> if you didn't pull the tubes out, would he have survived
> another day? He said yeah. Would you survive another day?
> Said yeah. Would you survive another day? Yeah. So they
> don't really know to this day whether that guy would still
> be alive and what kind of progress he would have been

24

> making over this past year. They really don't know, and
> they made a judgment call, and in making that judgment call,
> they want you to hold my client responsible for that, and
> that's just not right. That's just not right.

Id. at 558-59, 454 P.3d at 499-500.

In light of the evidence, we concluded that a causation jury instruction, which "would have enabled the jury to consider whether the intervening volitional conduct of the family and medical team interrupted the chain of causation between [the defendant's] actions and [decedent's] death," was warranted. Id. at 543, 454 P.3d at 484.

Here, the evidence noted by Angei - that Kanui-Flores was alive while at the hospital and that a decision was made to "pull the plug" – does not raise an issue as to causation. Unlike in Abella, here, there was no evidence produced at trial that Kanui-Flores was making "daily improvements"; nor was there testimony that Kanui-Flores would have recovered while on life support. Id. at 558, 454 P.3d at 499. Angei has not refuted testimony that the stab wound to Kanui-Flores's head was a "fatal wound" and that the stab wounds to his head and torso were the cause of death. Accordingly, the circuit court did not err by failing to instruct the jury on intervening causation.

**B.    There Was No Rational Basis in the Evidence to Support an Instruction for the Offense of Reckless Endangering Second**

The circuit court instructed the jury on the charged offense – Murder in the Second Degree – and the following lesser

included offenses: Manslaughter (Recklessly Causing Death), Assault in the First Degree, Assault in the Second Degree (Serious Bodily Injury or Substantial Bodily Injury), and Assault in the Third Degree. The jury was also instructed on the following defenses: mutual consent as a defense for Assault in the Third Degree, and self-defense as a defense for Murder in the Second Degree and its lesser included offenses.

"[J]ury instructions on lesser-included offenses must be given where there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense." Flores, 131 Hawai'i at 51, 314 P.3d at 128 (citation omitted). Here, Angei argues that the circuit court erred in not additionally instructing the jury on Reckless Endangering Second.[20] We disagree; there was no rational basis for the jury to convict Angei of Reckless Endangering Second while acquitting him of murder. Even if there was, the decision not to instruct on Reckless Endangering Second was harmless beyond a reasonable doubt.

Murder in the Second Degree occurs when a person "intentionally or knowingly causes the death of another person." HRS § 707-701.5. Reckless Manslaughter, the included offense of

---

[20] The ICA concluded that Reckless Endangering Second is a lesser included offense of Murder in the Second Degree. The State did not seek review of that determination.

which Angei was convicted, occurs when a person "recklessly causes the death of another person." HRS § 707-702(1)(a). Reckless Endangering in the Second Degree occurs when a person "[e]ngages in conduct that recklessly places another person in danger of death or serious bodily injury." HRS § 707-714(1)(a) (2014). "A person acts recklessly with respect to a result of his conduct when he consciously disregards a substantial and unjustifiable risk that his conduct will cause such a result." HRS § 702-206(3)(c) (2014).

State v. Manuel, 148 Hawai'i 434, 477 P.3d 874 (2020), is instructive here. In Manuel, which involved a prosecution for Assault in the Second Degree, we held that the circuit court erred in not instructing the jury on the lesser included offense of Reckless Endangering Second. Id. at 443, 477 P.3d at 883. The complaining witness (CW) testified that he encountered the defendant at a pier at night. Id. at 436, 477 P.3d at 876. The defendant appeared to have been drinking and began to argue with him. Id. at 436—37, 477 P.3d at 876—77. According to the CW, the defendant hit him on the head, and then stabbed him once in the chest; when the defendant tried to leave, the CW grabbed his bike and the CW's arm was sliced during the ensuing struggle. Id. at 437, 477 P.3d at 877. The jury convicted the defendant

of Assault in the Second Degree.[21]  Id. at 439, 477 P.3d at 879.

On appeal, this court held that the circuit court should have sua sponte instructed the jury on Reckless Endangering Second.  Id. at 436, 477 P.3d at 876.  We explained that the jury could have found that the defendant acted recklessly and that his conduct placed the CW in danger of serious bodily injury or death.  Id. at 442-43, 477 P.3d at 882-83.  Specifically, we noted that there was evidence that both the CW and defendant had been drinking, and there were inconsistencies in the CW's statements and testimony:

> Thus, a reasonable juror could have found that [the CW's] testimony was not entirely credible and that Manuel lacked the requisite intent, i.e., intentionally or knowingly, to commit second-degree assault.  However, a reasonable juror may still have determined that an intoxicated Manuel should have understood the potential risk of serious injury arising from opening a knife during an altercation.

Id. at 443, 477 P.3d at 883.

Notably, the CW in Manuel was stabbed only once before the defendant tried to leave the scene; the second cut occurred only after the CW chased down the defendant to prevent him from leaving.  Id. at 437, 477 P.3d at 877.

The circumstances in Manuel, where we held a reasonable juror could have concluded that the extent of the

---

[21]  The circuit court also instructed the jury on Assault in the Third Degree and Assault in the Third Degree by Mutual Affray.  Id. at 436, 477 P.3d at 876.

28

defendant's culpability was "opening a knife during an altercation," are distinguishable from those present here.  Id. at 443, 477 P.3d at 883.  Angei did not just open a knife; he plunged it through Kanui-Flores's temple and up to an inch and a half into his brain.  He also stabbed Kanui-Flores three more times, and slashed him another four times.  Thus, the evidence here established that Angei intended to stab Kanui-Flores (although his purpose in doing so was in dispute), and there was no basis for a reasonable juror to conclude that Angei's intent was limited to creating a "potential risk of serious injury." Id. at 443, 477 P.3d at 883; cf. State v. Moore, 82 Hawai'i 202, 212, 921 P.2d 122, 132 (1996) (holding that jury instructions on first and second degree assault were not required where there was no basis for a reasonable juror to conclude that the defendant, charged with attempted murder, intended to cause or was aware he might cause "only serious or substantial bodily injury" when he shot the CW at least six times at point blank range, causing five gunshot wounds to her upper body). Accordingly, the circuit court did not err in declining to instruct the jury on Reckless Endangering Second.

Moreover, even assuming arguendo that the circuit court erred, its failure to instruct the jury on that included offense was harmless beyond a reasonable doubt.

In Magbulos, 141 Hawai'i at 484-85, 498, 413 P.3d at

388-89, 402, the defendant was charged with and convicted of Murder in the Second Degree; the jury had been instructed on the lesser included offenses of Reckless Manslaughter and Assault in the First Degree. On appeal, the defendant argued that the trial court erred in denying his request to instruct the jury on three lesser included offenses: Assault in the Second Degree, Assault in the Third Degree, and Assault in the Third Degree by Mutual Affray. Id. After summarizing prior case law on jury instructions on lesser included offenses, the ICA held that "any error in failing to instruct on the lower-level assault offenses was harmless beyond a reasonable doubt." Id. at 499, 413 P.3d at 403. The ICA explained:

> [A]bsent unusual circumstances, the failure to instruct on a lesser included offense two levels below the offense for which the defendant is found guilty will ordinarily be harmless. In this case, [the defendant] is contending that the failure to instruct on lesser included offenses that are at least three levels below the second-degree murder for which the jury found him guilty entitles him to a new trial. It strains credulity to believe that the jury who found [the defendant] guilty as charged of second-degree murder, despite being instructed on the lesser included offenses of manslaughter and first-degree assault, might reasonably have found him guilty of the lower-level assault offenses if instructed on these offenses. We therefore conclude that there is no reasonable possibility that the Circuit Court's failure to instruct on the lower-level assault offenses affected the outcome of this case.

Id. (alteration in original).

The ICA's reasoning in Magbulos is applicable here. Similar to Magbulos, the jury at Angei's trial was instructed on four lesser offenses - Reckless Manslaughter, Assault in the First Degree, Assault in the Second Degree, and Assault in the

Third Degree – which extended several levels below the charged offense of Murder in the Second Degree. Of the charged and instructed offenses, the jury found Angei guilty of Reckless Manslaughter rather than the lesser offenses of First-, Second-, and Third-Degree Assault. As in Magbulos, it "strains credulity" to believe that, if instructed, the jury would have found Angei guilty of the even lesser offense of Reckless Endangering Second.

Because there was no rational basis in the evidence to support acquitting Angei of Murder in the Second Degree and convicting him of Reckless Endangering Second, the circuit court appropriately declined instructing the jury on this offense. Even if in error, the failure to instruct on Reckless Endangering Second was harmless beyond a reasonable doubt.

## V. CONCLUSION

For the foregoing reasons, we affirm the ICA's October 5, 2020 Judgment on Appeal, which affirmed the circuit court's November 20, 2018 Judgment of Conviction and Sentence.

Dana S. Ishibashi,
for petitioner

Chad M. Kumagai,
for respondent

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Faʻauuga Toʻotoʻo



31